LAMSON et al. v. BEARD. C. B. CONGDON & CO. v. SAME. PHELPS et al. v. SAME.

(Circuit Court of Appeals, Seventh Circuit. May 19, 1899.)

Nos. 526, 555, and 561.

1. REVIEW—JUDGMENT—SUFFICIENCY OF FINDINGS.

In determining whether a judgment is supported by a special finding, the sufficiency of the facts found is the sole question to be determined, and hence the admission of evidence of immaterial facts is not error.

2. BANKS AND BANKING — AUTHORITY OF PRESIDENT — MISAPPROPRIATION OF FUNDS.

If the directors of a bank, trusting the president's integrity or individual responsibility, authorized him to use drafts drawn on its funds for private purposes, whether paid for at the time or not, any loss resulting from the misuse of such authority would fall on the bank, and not on a third person, who had taken the drafts for value and in good faith, which in such case would be determined by the established rules governing the transfer of negotiable paper.

3. BILLS AND NOTES — PAYMENT BY BANK DRAFT—INQUIRY BY DRAWEE— NECESSITY.

A creditor, receiving a bank draft drawn to his order from his debtor in payment of the debt, is entitled to accept the draft without inquiry, not because of a presumption that the debtor had paid for the draft, but because it was drawn by the authorized officer of the bank in the usual course of business, acting without apparent or known interest in the transaction.

4. SAME—BONA FIDE PURCHASER—EQUITIES.

The receiver of such draft, though apparently an original party, as against the drawer is in effect an indorsee, and hence is only affected by equities of which he had notice before accepting it.

5. BANKS AND BANKING — DRAFTS BY PRESIDENT FOR PERSONAL USE — AUTHORITY TO DRAW—INQUIRY BY DRAWEE.

Where the president of a bank, as such, drew drafts on the bank's funds on deposit with its correspondents, payable to the order of certain brokers, for margins on transactions in futures carried for him personally, such payees are not bona fide holders of such drafts, but are put on inquiry as to the president's authority to draw the same on the bank's funds for his personal use, which inquiry they should have made from the directors of the bank; but they were under no obligation to undertake an examination of the bank's books to ascertain whether the president had reimbursed the bank.

6. SAME.

In the absence of special authority, conferred by the directors of a bank by resolution, acquiescence, or implied assent, the president of a bank has no authority to draw drafts on its funds in payment of personal debts.

7. SAME—RECOVERY OF MONEY--FINDINGS—CONSTRUCTION.

In an action by a bank to recover money fraudulently paid out by its president by means of drafts, a finding that the president was not a de-

positor, and that such wrongful appropriation constituted embezzlement, was not nullified by the fact that it was also found that the entries on the bank's books tended to show that the bank was paid for the drafts so drawn.

8. SAME.

Where a transaction between the president of a bank and defendants, in which the president paid defendants money belonging to the bank, which he wrongfully appropriated, was concealed from the bank, and the mere statement of the facts to the directors would have disclosed the fraud, defendants are liable to the bank for the money so received.

9. SAME—FRAUDULENT WITHDRAWALS BY PRESIDENT—NOTICE.

Possession of books by a bank, containing entries of drafts fraudulently drawn by the president in personal brokerage transactions, is not notice thereof to the bank, where the books were under the sole control of the president, and kept in such a manner as to conceal his defalcations.

10. SAME.

Knowledge by the president of a bank of his misappropriation of its funds in personal transactions is not notice to the bank.

11. SAME—COURSE OF DEALING—ESTOPPEL.

Where the president of a bank wrongfully appropriated the bank's funds to his personal use by means of drafts, which he so entered on the bank's books as to conceal their fraudulent character, the bank is not estopped by the president's course of dealing from denying his authority to draw drafts for such purpose.

12. SAME—TRIAL—FINDINGS—EFFECT.

A finding that money of a bank, appropriated by the president to his personal use by means of drafts, was wrongfully taken by him, is equivalent to a finding that he had no authority to draw and use the drafts.

13. SAME—DEFENSE—NEGLIGENCE.

In an action by a bank to recover the proceeds of drafts wrongfully drawn by its president and used for his personal benefit, the defense that he was permitted to draw them through the culpable negligence of the directors is unavailing, where there was no finding of such negligence, or that defendants were influenced thereby to accept the drafts, of which they had notice the president was making improper use.

14. BILLS AND NOTES—BANK DRAFTS—WRONGFUL ISSUANCE—ACCEPTANCE BY PAYEES—EFFECT.

Where the president of a bank, as such, drew drafts on its funds, in favor of certain brokers as payees, for margins on brokerage transactions, such drafts are neither commercial paper, nor contracts, until accepted by the payees; and by acceptance the payees become parties to their original execution, and hence are put on inquiry whether the president exceeded his authority in drawing them, and, if so, such payees are liable to the bank for their proceeds.

15. TRIAL—SPECIAL INSTRUCTIONS.

It was not error for the court to refuse a special instruction on an issue not pleaded, and impliedly excluded from the consideration of the jury.

In Error to the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

These are actions of assumpsit, brought by Robert R. Beard, as receiver of the First National Bank of Pella, Iowa, to recover of the respective plaintiffs in error, who are commission merchants at Chicago, the proceeds of drafts of the bank, drawn in their favor and delivered to them by E. R. Cassatt, then president of the bank, in discharge of individual liabilities incurred in transactions conducted by them for him on the board of trade at Chicago.

The plaintiffs in error in the first case are co-partners under the name of Lamson Bros. & Co.; in the third case, under the name of Milmine, Bodman &

Co.; and in the second case C. B. Congdon & Co. is the name of a corporation. The declaration in each case contains the customary common counts, and also special ·ounts, to which the drafts therein sued upon are made exhibits. Plea in each case, non assumpsit; and in the first case a trial by jury. The errors assigned in that case have reference to the giving and refusing of instructions. The evidence is in the record, and is without substantial conflict. The drafts, of which there were ten, were all drawn upon a lithographed or printed form, and, excepting dates and amounts, are like the first, which reads as follows:

"First National Bank.

"Pella, June 27, 1892.

"Pay to the order of Lamson Bros. & Co. $400, four hundred dollars.

"E. R. Cassatt, Pt.

"To National Bank of Illinois.    ·    Cashier."

The word "Cashier" is in print, and the letters "Pt.," opposite the name of Cassatt, were written by him to indicate his office as president of the bank. He sent the drafts by mail to Lamson Bros. & Co., in response to their demands, in order to maintain his margins, and in each instance they acknowledged receipt by a letter addressed to Cassatt individually. In their letter of December 20, 1893, they say, "Your a/c has credit for $200, received from First National Bank of your city," and in that of January 22, 1894, they say: "We received today from the First National Bank of your city their favor of the 20th instant, containing draft for $400, which we have credited to your account."

Under the court's charge, which upon the main question in the case followed the opinion of Judge Wallace in Anderson v. Kissam, 35 Fed. 699, the jury returned a verdict, upon which judgment was entered in favor of the plaintiff for the sum of $3,588, of which it is conceded the sum of $688 was for interest. In support of the court's charge there have been cited (in addition to Anderson v. Kissam, supra) Chrystie v. Foster, 9 C. C. A. 606, 61 Fed. 551; Moores v. Bank, 15 Fed. 141; Id., 111 U. S. 156, 4 Sup. Ct. 345; Claflin v. Bank, 25 N. Y. 293; Gerard v. McCormick, 29 N. E. 115, 130 N. Y. 261; Wilson v. Railway Co. (N. Y. App.) 24 N. E. 384; Shaw v. Spencer, 100 Mass. 384; Bank v. Wagner (Ky.) 20 S. W. 535. Per contra, the plaintiffs in error have cited Goshen Nat. Bank v. State, 141 N. Y. 379, 36 N. E. 316; Bank of New York Nat. Banking Ass'n v. American Dock & Trust Co., 143 N. Y. 564, 38 N. E. 713; Hanover Nat. Bank v. Same, 148 N. Y. 612, 43 N. E. 72; Kissam v. Anderson, 145 U. S. 435, 12 Sup. Ct. 960. This case was argued at the October session, 1898, Judge Showalter with the other circuit judges composing the court. In each of the other cases a trial by jury was waived by written stipulation, and the court made a special finding of facts, based in the main upon an agreed statement of the parties, and gave judgment for the plaintiff.

The findings in No. 555 are as follows:

"First. The plaintiff was before and at the time of the commencement of this suit, and is now, the receiver, duly appointed by the comptroller of the currency, of the First National Bank of Pella. The plaintiff was at the time of the commencement of this suit, and is, a citizen of the state of Iowa.

"Second. The defendant C. B. Congdon & Co. is a corporation organized under the laws of the state of Illinois, having its principal place of business in Chicago, in the Northern division of the Northern district of said state. Said corporation is a resident and citizen of the state of Illinois, and of the Northern division of the Northern district thereof, and was so organized and incorporated, and was such resident and citizen, at the time of the commencement of this suit.

"Third. The said First National Bank of Pella is situated at Pella, a town of about ·3,000 inhabitants, in the midst of a farming community, and was organized in 1871, under the banking laws of the United States, with a capital stock of $50,000. E. R. Cassatt was the principal person engaged in its organization, and after the year 1883, together with his relatives, owned a majority of the stock, all of which was controlled by Cassatt. From the time of the organization of the bank to its failure Cassatt was president, and the principal executive officer of the bank, and enjoyed in a high degree the confidence of its stockholders and of the people of Pella and of the surrounding country.

Subsequent to 1881 the management of the bank was entirely under the control of E. R. Cassatt. The board of directors performed their duties largely in a perfunctory manner, and their knowledge as to the affairs of the bank was derived almost exclusively from the statements made to them by Cassatt. Cassatt dictated the persons to whom loans should be made, and had the entire discretion as to the acceptance of all bills receivable which became part of the assets of the bank. The method by which the affairs of the bank were conducted, the duties which the clerks performed, the manner of selling exchange, and the other executive methods of the bank were devised by said Cassatt, and carried on under his directions, without interference from the directors. The board of directors reposed implicit confidence in Cassatt, and accepted his statements as true in regard to all the affairs of the bank, and made no examination of the bills receivable to ascertain whether they were spurious or not. Cassatt had charge of the bills receivable of the bank and of the cash chest. Cassatt was accustomed, from the organization of the bank down to the time of its failure, to draw drafts on the funds of said bank on deposit in other banks, signing such drafts in the name of himself as president. The affairs of the bank were examined twice a year by the examiner appointed by the comptroller of the currency of the United States. At the time of such examinations Cassatt was accustomed to exhibit to the examiner the bills receivable and the cash on hand, and then return them to the safe. At such times the proper amount of cash was on hand and such bills receivable as the books of the bank showed to be on hand. The balance of the stock of the bank, outside of Cassatt's holdings, were held in small amounts, the average being about $2,000 of stock (at its par value).

"Fourth. The said First National Bank of Pella went into the hands of a receiver June 25, 1895. At the time of its failure it was for the first time ascertained by its stockholders, and by the other officers, that said Cassatt was a defaulter to the bank in the sum of about $65,000. Such sum had been taken by Cassatt, from time to time, from the moneys of the bank, and had been concealed by means of forged, spurious, and other fictitious notes; other evidences of loans having been put into the bank by Cassatt. The forged and fictitious notes were so adroitly executed that there was nothing that would suggest to the ordinary observer that the notes were not genuine, as they purported to be. The said Cassatt has since that time been duly indicted, tried, and convicted for the embezzlement of said $65,000, and is now serving his sentence on account of such conviction.

"Fifth. The said Cassatt began to have business dealings with C. B. Congdon & Co., a firm consisting of C. B. Congdon and A. C. Davis, commission merchants on the Board of Trade in the city of Chicago, in 1894, continuing to have such transactions down to and including a portion of September, 1894. On or about September 21, 1894, the defendant corporation of C. B. Congdon & Co. was duly organized under the laws of the state of Illinois and authorized to begin business. On said September 29, 1894, said corporation duly purchased the good will and property of the said firm of C. B. Congdon & Co. and of the firm of A. C. Davis & Co., said A. C. Davis being a member of both firms. The stockholders of said corporation were, and at the time of said transaction continued to be, and still are, the same men who constituted the firm of C. B. Congdon & Co. and the firm of A. C. Davis & Co. The officers of said corporation, at the time of its organization and at the time the drafts were made in the suit here, were C. B. Congdon, president; A. C. Davis, vice president; William S. Warren, secretary; Charles H. Hulburd, treasurer,— the said C. B. Congdon being the same C. B. Congdon who belonged to the previous firm of C. B. Congdon & Co., and the said A. C. Davis being the same A. C. Davis who belonged to the firm of C B. Congdon & Co. The directors of said corporation were at the beginning, and have ever since continued to be, C. B. Congdon, A. C. Davis, C. H. Hulburd, William S. Warren, and E. A. Lancaster. From the time said corporation of C. B. Congdon & Co. was organized the said Cassatt continued his dealings, formerly had with C. B. Congdon & Co., with the said corporation. The said dealings with the said corporation and its predecessor, C. B. Congdon & Co., were substantially as follows: The said Cassatt would, either personally or by wire, direct the said corporation or firm to purchase or sell certain futures in either wheat,

94 F.—3

oats, or provisions, which said direction would be executed by the corporation on the Chicago Board of Trade by buying of or selling to some other broker on such board the futures stipulated. Such purchases or sales would thereupon be carried by said corporation or firm in the name of and for the benefit of said Cassatt until another order was received by Cassatt closing out the same, either by purchase or sale, as the case might be. Under the rules of the Board of Trade the corporation or firm would have been obliged to have delivered, in case of sales, or accepted, in case of purchases, from the brokers with whom they had transactions, the cereals or provisions in question when the deals matured, and the said Cassatt would have been obliged to have taken or delivered to the corporation or firm the cereals or provisions called for in such deals at the time they would have matured. As a matter of fact, however, none of the sales made by the corporation or firm on account of Cassatt ever resulted in the delivery of any grain or provisions, and none of any of the purchases made on his account ever resulted in obtaining, or the acceptance of, any grain or provisions. The deals were, in nearly every instance, closed before the future to which they related had arrived, and without the passing or intention to pass of any actual grain or provisions. All the transactions of Cassatt with the said corporation or firm were intended by him to be purely speculative transactions in futures on the Board of Trade, and were so understood by the said corporation or firm, and none of the said transactions contemplated the purchase or sale of grain or provisions with any other purpose than the subsequent disposal of the same without the actual delivery or acceptance of the grain or provisions involved. The purchases and sales were numerous, and represented, in the aggregate, a large amount of dealing. The defendants and the firm were protected from losses by margins put up from time to time with them by said Cassatt for that purpose. The general course of said speculation was unfavorable to Cassatt. He occasionally had some profits, but more frequently suffered losses. The whole course of the transactions would have disclosed to an ordinary observer, fully informed of the facts, that Cassatt was gradually losing, and that some funds owned or controlled by him must have been gradually eaten into by the losses from time to time incurred and the margins put up. The defendants themselves must have known this prior to and at the time they received the drafts sued upon, unless they willingly suffered themselves to be deceived.

"Sixth. The said Cassatt, in order to carry on his deal with the said firm and defendants, kept two accounts in the said First National Bank of Pella, one in his own name, and the other in the name of E. R. Cassatt & Co. During the period of said deals Cassatt remitted to the said firm, on account of the margins aforesaid, from time to time, drafts similar to the drafts sued on in these cases, including the drafts sued upon; that is to say, the drafts signed by the First National Bank of Pella, by E. R. Cassatt, president, drawn upon the National Bank of Illinois, and payable to the firm. These drafts drawn upon the firm of C. B. Congdon & Co. bore the dates, and were for the amounts, as follows: 1894: January 10th, $400; January 24th, $200; February 10th, $500; February 16th, $600; April 25th, $500; May 12th, $500; May 15th, $500; May 17th, $1,100; July 18th, $600; July 20th, $400. Also, there were sent to the defendant the corporation of C. B. Congdon & Co. drafts as follows: 1894: October 3d, $2,000. 1895: January 23d, $2,000. Said drafts, having been received by the said firm of C. B. Congdon & Co. and the said corporation of C. B. Congdon & Co., and credited to the said Cassatt on their books, respectively, were indorsed on the back by the said firm of C. B. Congdon & Co. and the said corporation of C. B. Congdon & Co., respectively, and deposited to the credit of their account in their bank of deposit in Chicago, the Corn Exchange Bank, by which bank they were passed to the National Bank of Illinois, and charged by said last-named bank to the First National Bank of Pella. Such drafts were, at a date subsequent to their issue, duly credited to said National Bank of Illinois, and charged to some account on the books of said Pella Bank having a credit balance appearing upon said books of sufficient amount to pay or offset such charges, except, however, in so far as the facts stipulated in this paragraph may be modified by the following statement, to wit, that at the time of the failure of the Pella Bank the books of said National Bank of Illinois showed that drafts to the amount of

\$3,000 had been drawn by said Pella Bank upon said National Bank of Illinois and not credited to it upon the books of said Pella Bank.

"Seventh. None of said drafts were used or intended to be used to pay off any debt or obligation of said bank, but all were used to supply the margins in the private transactions of the said Cassatt with the said firm of C. B. Congdon & Co. and said corporation of C. B. Congdon & Co., as aforesaid. Said transactions were all kept secret from the bank by said Cassatt.

"Eighth. There is no evidence from either side, other than the foregoing, tending to show that the said Cassatt was or was not a man of means, independently of his holdings in the said First National Bank of Pella. Both the firm of C. B. Congdon & Co. and the corporation of C. B. Congdon & Co. knew that Cassatt was president of the bank, and had access to its funds, but made no inquiry as to whether said Cassatt had means, independently of his holdings in said bank, and made no inquiry of said Cassatt, the other officers of the bank, or any one else likely to know, whether said Cassatt was using his own means in the speculative transactions aforesaid, and no inquiry looking in that direction.

"Ninth. The court finds that the avails of the drafts sued upon in this case, through the means already described, were taken purposely by the said Cassatt, without authority of law, but as an act of theft and embezzlement from the funds of said bank, and that the defendants, in receiving the avails of said drafts, were in fact receiving the moneys stolen by said Cassatt from said bank. The court further finds that reasonable and prudent men, having no selfish interests to subserve, would have been led, by the facts in possession of the firm of C. B. Congdon & Co. and of the defendant, to suspect that said Cassatt might be unlawfully using the funds of said bank to supply the margins transmitted to the firm of C. B. Congdon & Co. and the corporation of C. B. Congdon & Co., respectively.

"Wherefore, the court finds the issues for the plaintiff and against the defendants, and assesses the plaintiff's damage at the sum of \$2,323.61, of which \$2,000 is principal and \$323.61 interest.            P. S. Grosscup, Judge."

In No. 561 the findings, with a change of the names of the defendants, are the same, with the following exceptions:

The fifth commences with this statement: "Fifth. The said Cassatt began to have business dealings with the defendants, commission merchants on the Board of Trade, in the city of Chicago, in 1884, continuing to have such transactions down to and including a portion of the year 1894,"—and also contains the following: "The money which was sent to Milmine, Bodman & Co. to pay the losses aforesaid was in turn paid out by Milmine, Bodman & Co., for the purpose of discharging the contracts made in behalf of Cassatt by them, upon which the losses occurred, and no profit resulted to Milmine, Bodman & Co. by reason of any of the dealings with Cassatt, except the commissions which they earned as brokers in negotiating the transactions for him."

The sixth, after the first sentence, proceeds as follows: "During the period of said deals, Cassatt remitted to the defendants, on account of margins aforesaid, from time to time prior to the drafts sued on in this case, 27 drafts, each of which was exactly similar to the drafts sued on in this case; that is to say, each was signed, 'First National Bank of Pella, by E. R. Cassatt, President.' All of these drafts were collected by the defendants in the same way as the drafts in the suit. The earliest of the series of drafts, prior to the drafts in suit, was August 21, 1884, and the latest was April 6, 1891. Of these drafts, there were 5 in 1884, 8 in 1885, 6 in 1886, 2 in 1887, 1 in 1888, 1 in 1890, and 2 in 1891, and were for the amounts and bore the dates as follows: 1884: August 21st, \$500; October 11th, \$300; November 19th, \$300; December 1st, \$500; December 9th, \$300. 1885: January 5th, \$200; February 19th, \$250; March 25th, \$500; April 27th, \$500; July 27th, \$425; October 5th, \$300; October 10th, \$1,500; October 15th, \$1,000. 1886: April 12th, \$1,000; April 17th, \$1,000; September 11th, \$300; September 25th, \$300; October 11th, \$300. 1887: February 19th, \$300; July 8th, \$300. 1888: December 3d, \$1,000. 1889: March 18th, \$800; April 13th, \$500. 1890: February 13th, \$500. 1891: January 6th, \$500; April 6th, \$1,000. Each of said drafts was charged by the National Bank of Illinois to the First National Bank of

Pella, and monthly statements were sent by the National Bank of Illinois to the First National Bank of Pella, which were checked up by the clerks in the latter bank, but during the two years immediately preceding the failure the checking was done by Cassatt himself. Most of the drafts sent by E. R. Cassatt, as aforesaid, both those prior to the ones in suit, as well as the drafts sued upon in this case, except as hereinafter noted, were charged upon the books of the First National Bank of Pella, either to the account of E. R. Cassatt, or to the account of E. R. Cassatt & Co., which account, at the time of such charging, had an apparent credit balance sufficient to pay or offset the charge so made against it. Such of said drafts as were not charged to E. R. Cassatt, or to E. R. Cassatt.& Co., were charged to some other account upon the books of said bank, which account, at the time of said charges, had an apparent credit balance sufficient to pay or offset the charges so made against it. Said drafts were all signed by E. R. Cassatt as president. The drafts sued on in this case were all drawn upon the National Bank of Illinois, payable to Milmine, Bodman & Co., and signed 'First National Bank of Pella, by E. R. Cassatt, President,' and were of dates and amounts as follows: 1891: August 20th, $1,400; August 31st, $800; September 19th, $500. 1892: June 13th, $2,000; August 27th, $1,000; September 5th, $1,000; October 22d, $1,000; October 28th, $1,000. 1893: January 30th, $1,000; February 14th, $600; February 18th, $1,500; March 13th, $600; June 21st, $2,500; November 23d, $300; December 21st, $500. `1894: January 24th, $300; February 10th, $500; February 12th, $600."

And the seventh contains the following additional statement: "The telegraphic correspondence between said Cassatt and the defendants was carried on in cipher. On one occasion the defendants failed to observe this cipher, and on a protest from said Cassatt promised that such oversight should not occur again. It is not unusual, however, for Board of Trade commission men to communicate with their customers in cipher. The cipher used in this case was the so-called 'Robinson Cipher.' Nearly every dealer in the country has a copy of this. The telegrams were neither signed nor addressed in cipher, but were addressed and signed by the correct names of the respective parties."

In No. 555 the following propositions and the authorities cited are relied upon:

(1) "There was nothing in the form of the draft sued on to create a suspicion that Cassatt was using the funds of the bank in the payment of his individual indebtedness. Goshen Nat. Bank v. State, 141 N. Y. 179, 36 N. E. 316; Claflin v. Bank, 25 N. Y. 297; Bank of New York Nat. Banking Ass'n v. American Dock & Trust Co., 143 N. Y. 564, 38 N. E. 713; Huie v. Allen (Sup.) 34 N. Y. Supp. 577; Dike v. Drexel (Sup.) 42 N. Y. Supp. 985; Goodman v. Simonds, 20 How. 364; Bank of Edgefield v. Farmers' Co-op. Mfg. Co., 2 C. C. A. 637, 52 Fed. 98–103; Bank v. Holm, 19 C. C. A. 94, 71 Fed. 489; Kaiser v. Bank, 24 C. C. A. 88, 78 Fed. 281; Anderson v. Kissam, 35 Fed. 699; Kissam v. Anderson, 145 U. S. 435, 12 Sup. Ct. 960."

(2) "The directors of the Pella Bank were guilty of culpable negligence, which far outweighed any slight negligence of defendant."

(3) "The course of dealing between the bank and the defendant, and its predecessor firm of the same name, created a presumption, upon which defendant could rely, that the draft sued on was properly obtained by Cassatt, and that the defendant was entitled to receive its avails in payment of a debt due from Cassatt. There was implied authority for his act. Martin v. Webb, 110 U. S. 7, 3 Sup. Ct. 428; Hanover Nat. Bank v. American Dock & Trust Co., 148 N. Y. 612, 43 N. E. 72."

(4) "Cassatt paid for the draft by the use of the credits the bank had given him. He defrauded the bank in his obtention of the credits, but that was another transaction. So long as the credits subsisted, they could, as between the bank and the defendant, be used as they were used. Wilson v. Railway Co. (N. Y. App.) 24 N. E. 384."

(5) "Assuming, arguendo, that the form of the draft was such as ought to have created suspicion that Cassatt might be improperly using the funds of the bank in payment of his individual debt, and that the defendant was charged with the duty of inquiry, and made none, it is only chargeable with a knowl-

edge of such facts as it would have learned by the exercise of ordinary diligence. Birdsall v. Russell, 29 N. Y. 220; Woolen Mills v. Sibert, 81 Ala. 140, 1 South. 773; Knapp v. Bailey (Me.) 9 Atl. 122."

In No. 561 the following:

(1) "The defendants were under no duty to inquire into the facts of transactions anterior to, and entirely separate and distinct from, the transactions to which they were parties."

(2) "The court erred in entering judgment against the defendants, when the findings showed that Cassatt had paid the bank for every one of the drafts. Goshen Nat. Bank v. State, 141 N. Y. 379, 36 N. E. 316; Wilson v. Railroad Co., 120 N. Y. 145, 24 N. E. 384; Hanover Nat. Bank v. American Dock & Trust Co., 148 N. Y. 612, 43 N. E. 72; Cowing v. Altman, 71 N. Y. 435; Railway Co. v. Sprague, 103 U. S. 756."

(3) "The fact that the bank had allowed Cassatt, for a period of seven years prior to the dates of the drafts in suit, to draw drafts in a manner exactly like the manner in which he drew the drafts sued on, established a course of dealing which estops the bank to deny that Cassatt had a right to act according to this established course. Bronson's Ex'r v. Chappell, 12 Wall. 681; Martin v. Webb, 110 U. S. 7, 3 Sup. Ct. 428; Merchants' Bank v. State Bank, 10 Wall. 604; Hooe v. Oxley, 1 Wash. (Va.) 19; McDonnell v. Bank, 20 Ala. 313; Martin v. Manufacturing Co., 9 N. H. 51; Weaver v. Ogletree, 39 Ga. 586; Railroad Co. v. Schuyler, 34 N. Y. 30; Hanover Nat. Bank v. American Dock & Trust Co., 148 N. Y. 612, 43 N. E. 72."

(4) "One who receives a bank draft, fair on its face, signed by the officer duly authorized to sign drafts, may take it as currency, even though he receives it from the officer who signs it, and in payment of the latter's debt. Goshen Nat. Bank v. State, 141 N. Y. 379, 36 N. E. 316; Goodman v. Simonds, 20 How. 343; Railroad Co. v. Schuyler, 34 N. Y. 30; Bank of Edgefield v. Farmers' Co-operative Mfg. Co., 2 C. C. A. 637, 52 Fed. 98; Swift v. Smith, 102 U. S. 442."

(5) "Even if Milmine & Co. had inquired, they could not possibly have found out the secret reasons existing between Cassatt and the bank why it was improper for Cassatt to draw these drafts."

Per contra, for the defendant in error, the following:

(1–3) Questions of practice.

(4) "The receipt by the plaintiff in error of the drafts of the Pella National Bank, signed by Cassatt in his official capacity, to be used as margins for his personal trades, put the plaintiffs in error upon notice that Cassatt was using the bank's funds without authority, and plaintiffs in error took such drafts at their peril, and are accountable to the receiver for the avails thereof. (a) The distinction asserted in counsel's brief as to this point does not exist. Hanover Nat. Bank v. American Dock & Trust Co., 148 N. Y. 612, 43 N. E. 72; Moores v. Bank, 15 Fed. 141; Id., 111 U. S. 156, 4 Sup. Ct. 345; Trust Co. v. Boynton, 19 C. C. A. 118, 71 Fed. 797; Gerard v. McCormick, 29 N. E. 115, 130 N. Y. 261; Anderson v. Kissam, 35 Fed. 699, 703. (b) The form of these drafts put plaintiffs in error upon notice. Anderson v. Kissam, 35 Fed. 699, 703; Chrystie v. Foster, 9 C. C. A. 606, 61 Fed. 551; Moores v. Bank, 15 Fed. 141; Id., 111 U. S. 156, 4 Sup. Ct. 345; Claflin v. Bank, 25 N. Y. 293; Gerard v. McCormick, 29 N. E. 115, 130 N. Y. 261; Wilson v. Railway Co., 24 N. E. 384, 120 N. Y. 145; Shaw v. Spencer, 100 Mass. 382, 384; Bank v. Wagner (Ky.) 20 S. W. 535; Trust Co. v. Boynton, 19 C. C. A. 118, 71 Fed. 797. (c) The defect appearing upon the face of the drafts, the doctrine of Bank of Edgefield v. Farmers' Co-op. Mfg. Co. and Goodman v. Simonds, cited by plaintiffs in error, does not apply. (d) The circumstances of the case of Goshen Nat. Bank v. State were radically different from that at bar. (e) The fact that by common usage bank drafts are treated as cash, if that be a fact, cannot be availed of by one who receives the bank's draft, signed by the president, in payment of the president's debt, to relieve the recipient from the operation of the rule that he who knowingly receives from an agent, and on the agent's account, that which belongs to the principal, does so at his peril. Anderson

v. Kissam, 35 Fed. 699, 703; Shaw v. Spencer, 100 Mass. 384; Moores v. Bank, 15 Fed. 141; Id., 111 U. S. 156, 4 Sup. Ct. 345."

(5) "Having failed to make inquiry, the plaintiffs in error are bound by the actual facts as they existed, and will not be heard to contend that inquiry would have been unavailing. Shaw v. Spencer, 100 Mass. 384; Trust Co. v. Boynton, 19 C. C. A. 118, 71 Fed. 797; Manufacturing Co. v. Whitehurst, 19 C. C. A. 130, 72 Fed. 502."

(6) "The course of dealing between the bank and plaintiffs in error did not create a presumption, upon which plaintiffs in error could rely, that the draft sued upon was properly obtained by Cassatt, and that the plaintiffs in error were entitled to receive its avails in payment of a debt due from Cassatt. There was no implied authority for his act. Chrystie v. Foster, 9 C. C. A. 606, 61 Fed. 551; Anderson v. Kissam, supra; Wright's Appeal, 99 Pa. St. 425; Hill v. Publishing Co. (Mass.) 28 N. E. 142; Powell v. Rogers, 105 Ill. 318; Berwind v. Schultz, 25 Fed. 912; Clews v. Bardon, 36 Fed. 617; Briggs v. Spaulding, 141 U. S. 131, 11 Sup. Ct. 924; Percy v. Millaudon, 8 Mart. (N. S.) 68, 74, 75."

(7) "The court found, in effect, that the transactions on account of which these drafts were forwarded were gambling deals. Therefore the avails of the drafts could be recovered by the receiver, whether the brokers were or were not put on notice. (a) The finding is that neither party intended actual sales or purchases, but purely speculative transactions in 'futures.' The intent governs. Irwin v. Williar, 110 U. S. 499, 4 Sup. Ct. 160; Boyd v. Hanson, 41 Fed. 174; Insurance Co. v. Watson, 30 Fed. 653; Kirkpatrick v. Adams, 20 Fed. 287; Embrey v. Jemison, 131 U. S. 336, 9 Sup. Ct. 776; 2 Benj. Sales (6th Am. Ed.) 828. (b) The broker is particeps criminis. Irwin v. Williar, 110 U. S. 499, 510, 4 Sup. Ct. 160. (c) The intent is a question for the jury (in this case for the court to find, as a question of fact). Kirkpatrick v. Adams, 20 Fed. 287. (d) A principal may recover moneys gambled away by his agent. McAllister v. Oberne, 42 Ill. App. 287; Smith v. Ray, 89 Ga. 838, 16 S. E. 90; Mason v. Waite, 17 Mass. 560; Corner v. Pendleton, 8 Md. 337; Caussidiere v. Beers, *41 N. Y. 198, 1 Abb. Dec. 333; Burnham v. Fisher, 25 Vt. 514; Pierson v. Fuhrmann (Colo. App.) 27 Pac. 1015."

D. M. Kirton, for plaintiffs in error Lamson Bros. & Co.

Charles H. Dupee, for plaintiff in error C. B. Congdon & Co.

Lockwood Honoré and John P. Wilson, for plaintiffs in error E. H. Phelps and L. W. Bodman.

Frank H. Scott, John H. Hamline, and Frank E. Lord, for defendant in error.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

WOODS, Circuit Judge, after stating the facts, delivered the opinion of the court.

It is not important to inquire whether the court erred in admitting evidence of immaterial facts stated in the special findings. The one question upon a special finding or verdict is "of the sufficiency of the facts found to support the judgment." In determining that question, of course, every relevant and material fact found must be considered, and every irrelevant or immaterial fact rejected; and when the fact has been excluded from consideration there can remain no harm from the error of admitting the evidence by which it was established. The special findings recite many facts and circumstances which, though not irrelevant, are of an evidentiary character only. The ultimate facts on which the rights of the respective parties must be determined are few. They are comprehended in the statement that Cassatt, being president and practically in sole control of the bank, without authority, and without the knowledge of any other officer or stockholder, discharged his individual liabilities to

the plaintiffs in error, respectively, by sending them drafts of the bank, payable to their order, and drawn upon the bank's correspondent in Chicago, with which it had sufficient moneys out of which the drafts, after indorsement by the payees, were duly paid. Much discussion has been expended upon the effect of the form of the drafts, in connection with the use to which they were put, as notice to the payees that they were drawn without authority; but, before entering upon that inquiry, it will be well to dispose of minor contentions.

Assuming that the plaintiffs in error, when the drafts were tendered them, were put upon inquiry, it is asked, what would have been the subject of inquiry? and what facts would have been developed? It is not accurate to say that the inquiry would have been, "Did Cassatt pay the bank for the drafts?" Payment for the drafts, doubtless, would have been important evidence, but not necessarily conclusive upon the true point of inquiry, which was, "Did Cassatt have authority to draw the drafts?" He might have had money in the bank, or have put it there at the time of drawing the drafts, and yet have been without authority to draw them; and without money on deposit, and without present payment, his authority to draw in the form and for the purpose proven might have been beyond dispute. If, trusting to his integrity and individual responsibility, the directors authorized him to use the drafts of the bank for his individual purposes, whether paid for at the time or not, any loss resulting from a misuse of that authority ought, of course, to fall upon the bank, rather than upon a third person, who in good faith had paid value for the paper; and the question of good faith would be determined by the ordinary rules applicable to the transfer of mercantile paper. The fallacy or inapplicability of the supposed case of John Doe, living at Pella, and procuring of the bank a draft payable to the order of a distant creditor, and forwarding the draft to the creditor in discharge of the debt, is evident. It is, doubtless, a not unusual practice for debtors to obtain and send to their creditors bank drafts, drawn payable to the creditors, and, of course, in every such case the creditor knows that the money of the bank is being used to pay to him the debt of another,—in the case supposed, the debt of John Doe. But in such cases the creditor may accept the draft without inquiry, not, as counsel have said, because of a presumption that the debtor had paid for the draft, but because the draft had been drawn by the authorized officer of the bank in the usual course of business, acting without apparent or known personal interest in the transaction. The receiver of such a draft, though named as payee, and on the face of the paper apparently a party to the original execution thereof, is not so in fact, but, as against the drawer, is in effect an indorsee, affected only by vices or infirmities of which he had notice before he accepted it. He might know that the draft had not been paid for, and yet take it on the assumption of regular and proper execution upon some other consideration than payment. The inquiry, therefore, which these plaintiffs in error should have made, was whether Cassatt had authority to draw drafts of the bank upon funds of the bank in possession of its correspondents for use in his individual transactions. Such an inquiry involved no difficulty beyond communicating to the directors of the bank, other than Cassatt, the fact that such a draft or drafts had been tendered in discharge of

liabilities incurred in dealings upon the Board of Trade in Chicago, and asking whether the execution of the paper had been authorized. There can be little doubt what would have been the result of such an inquiry, accompanied with a frank and full statement of the facts as they were known to the payees of any of the drafts in suit at the time of execution. It would not have needed a discovery of Cassatt's fraudulent bookkeeping to enable the directors to say whether the execution of such paper had been theretofore authorized, or then had their approval. As contended, it was clearly no duty of the plaintiffs in error to undertake an examination of the books, which, once they commenced inquiry into the management of the bank, they would have learned had been wholly in the keeping of Cassatt, and of clerks who could not be expected to testify against him. Inquiry of Cassatt, too, it is to be presumed, would have been useless, and therefore, if made, would not have met the requirement of the law. The one thing necessary to be known was whether Cassatt had authority to make the proposed use of the bank's paper. The authority could have come only from the directors, by direct resolution or by acquiescence or implied assent, and the plain, unmistakable course was to push the inquiry, wherever begun, to the source of authority.

It is a perversion of speech to say that "the findings showed that Cassatt had paid the bank for every one of the drafts," or that if the defendants had gone to Pella, and had ascertained the facts, they would have found that Cassatt was a depositor in the bank, that he had charged each draft to his account, that he had on deposit ample funds to meet the charge, that he gave due credit on the books of the bank to its Chicago correspondent for the amount of each draft, and that no step in the transaction was hidden from the bank, but was known to it and recorded in its books, and that a statement of the transactions to the bank could have caused no surprise, because the bank knew of each as it occurred during the whole period of twelve years. The entries on the books, it may be said, tended to show the facts as stated; but the entire finding shows that Cassatt was not a depositor, and in no way made good to the bank the moneys taken from it by means of the drafts, which takings, it is expressly found, were acts of theft or embezzlement. That finding of the ultimate fact of wrongful and unauthorized appropriation cannot be overcome by proof of book entries, which, even if honestly made, would amount only to evidence tending to show the contrary. False entries took no money out of, and put none into, the bank; and it was not for the fraudulent bookkeeping, or forgeries, or any other wrong or series of wrongs which preceded the execution of the drafts, that the plaintiffs in error were held responsible. On the contrary, we agree that, if they are to be compelled to make restitution, it is because the particular sums which they received were wrongfully taken by Cassatt from the bank, and they were parties to the wrong. This proposition does not depend upon, and cannot be refuted by, the bookkeeping disclosed in the special finding. It embraces the three propositions contended for by counsel, namely:

"(1) The person from whom restitution is sought must have been a party to the particular transaction in which the wrong was accomplished. (2) The par-

ticular transaction to which such person was a party must have been hidden from the wronged party. (3) A mere statement to the wronged party of the facts of such particular transaction would have at once disclosed the fraud."

While the transactions appeared upon the books, as stated in the findings, it is a misuse of words, and inconsistent with honest thought, to say that they were known to the bank. Possession of facts, in books purposely kept in a manner to conceal the truth, is not, in law or morals, knowledge of the facts. Cassatt alone had knowledge of the truth, and, though he was president, his knowledge of his own frauds, perpetrated for his individual purposes, was not attributable to the bank.

The foregoing considerations dispose of the proposition that the bank, by allowing Cassatt to make a like prior use of drafts drawn by himself, had established a course of dealing which estops the bank to deny his authority. Of course, an estoppel may arise out of such a course of dealing, but whether, in a particular case, it has arisen is a question of fact depending upon the circumstances. It is hardly credible that in the facts here disclosed a jury, or a right-minded court, could find an estoppel; but it is enough to say that it has not been found, and that the facts supposed to point that way which are stated in the finding do not overcome the ultimate fact stated that the sums for which these drafts were drawn were wrongfully taken by Cassatt. That is equivalent to a direct finding that he had no authority to draw and use the drafts in that way. For the same reasons the proposition that the directors of the bank were guilty of culpable negligence is unavailing. There is no finding that there was such negligence, nor, if there were, that the plaintiffs in error were influenced by it to accept the drafts, of which, on the facts known to them, Cassatt was making an improper use.

These considerations of bookkeeping, course of dealing, negligence of directors, and estoppel aside, the main question is simplified: When Cassatt tendered these drafts,—each one of them to the payee named in it in payment of an individual obligation, in which the bank was not interested,—was the taker, accepting the paper in discharge of the debt, a purchaser in good faith, or was he put upon notice of Cassatt's lack of authority to draw upon the funds of his bank for his individual purposes? Upon that question our conclusion is that the opinion in Anderson v. Kissam, 35 Fed. 699, is sound in principle and in accord with the weight of authority. The judgment rendered in that case, it is true, was reversed, but upon a minor point, unconnected with the main question, which there, as here, was fundamental; and the fair inference would seem to be that if the supreme court, with the question before it, had doubted the ruling and opinion below in that respect, it would not have left the question undetermined.

The case of Goshen Nat. Bank v. State, upon which the plaintiffs in error chiefly rely, is distinguishable. The drafts in that case were drawn by the cashier, and were used to pay his individual debt; but, as the opinion is careful to state, it was "proved on the trial that the cashier had the custody and possession of the blank drafts for the claimant [the bank], and that he had the right to sign drafts drawn by the claimant on its corresponding banks, and that he had the right

ιο draw a draft on the corresponding bank of the claimant for himself, upon the same terms that he had to draw a draft for a stranger, * * * which means," as the court assumed, "upon payment to the bank of the amount of the draft." That this proof of special authority to draw a draft for his own use was the distinguishing point of the decision is declared in the later case of Bank of New York Nat. Banking Ass'n v. American Dock & Trust Co., supra, where it was held that a by-law of a warehouse company, authorizing an officer of the company to sign warehouse receipts, did not authorize him to sign a receipt for his own goods. "It is an acknowledged principle of the law of agency," it was there said, "that a general power or authority given to the agent to do an act in behalf of the principal does not extend to a case where it appears that the agent himself is the person interested on the other side. If such a power is intended to be given, it must be expressed in language so plain that no other interpretation can rationally be given it; for it is against the general law of reason that an agent should be intrusted with power to act for his principal and for himself at the same time." See, also, Hanover Nat. Bank v. American Dock & Trust Co., 148 N. Y. 612, 43 N. E. 72.

It is urged, however, "that there is a clearly-defined distinction between the acts of a cashier or president of a bank, in issuing its paper, and that of any ordinary agent." There are dicta in some of the opinions cited which, without attempting to define it, assert in general terms that there is a distinction. For instance, in Bank of New York Nat. Banking Ass'n v. American Dock & Trust Co., supra, in addition to what we have already quoted in reference to the case of Goshen Nat. Bank v. State, the court said: "And we also held, for the reason therein stated, that there was a difference in the case of bank or cashier's drafts from most cases of agency." There is a plain difference in the fact that such drafts, once they have been issued, are commercial paper, and may be accepted in trade and commerce without inquiry into the consideration for their issue. No other basis for a distinction is suggested in Goshen Nat. Bank v. State, and that difference, it is to be observed, is not in the character or extent of the agent's authority, but in the nature of the subject on which it is exercised. It is true, as there said, that "bank or cashier's drafts are used so enormously at the present time in the payment or settlement of debts, or in other commercial transactions, that they have almost acquired the characteristics of money." An officer of a bank, however, has no right to appropriate the money of the bank to his individual uses, and, though a creditor, when offered money by his debtor, ordinarily may accept it without inquiry, yet, if, at the time he receives it, he is told or knows that it belongs to another, for whom his debtor is an agent or trustee, on the plainest principles he acquires no title as against the true owner. If, for instance, Cassatt had sent to the plaintiffs in error money of the bank, instead of drafts, advising them that it belonged to the bank, there could be no question of their liability to make restitution; and in what respect is their position better as presented than it would be on the facts supposed, even conceding that the drafts sent them were the same, or "almost the

same," as money?  The drafts bore proof on their face that they were drawn upon the funds of the bank; and that they were not drawn in the course of the bank's business, but in discharge of individual liabilities of the president of the bank to themselves, they, of course, understood.  They therefore knew that, unless there had been conferred upon Cassatt an unusual and special authority, like that given the cashier in Goshen Nat. Bank v. State, supra, to sign and issue drafts of the bank in his private transactions, the paper sent them was unauthorized, and that for the proceeds thereof they would be liable to the bank or its representatives.

It is evident, however, that the drafts in question, when offered the plaintiffs in error, were not commercial paper, capable of treatment as money, and that the considerations of public policy on which the bona fide holder of such paper is protected, even though the rights of an antecedent holder be questionable, have no application or relevancy to the case.  The drafts were drawn in favor of plaintiffs in error, and until accepted by them they were not contracts, and by accepting them they did not become assignees or purchasers of existing obligations, but simply parties to the original execution thereof, into whose rights the way to full inquiry is open, unless closed by some estoppel outside of the paper itself, whatever its form.  A primary party to the execution of instruments originated as these were cannot be a "bona fide purchaser," in the sense of the law merchant, and to hold the payee of such paper responsible for the proceeds received upon his own negotiation of it to a third party, who will be presumed to be an innocent purchaser, no more tends to discredit the paper, as an agency of business, than it tends to impair the value of money as a medium of exchange to hold one who receives it wrongfully accountable to the rightful owner.  If a bank president or cashier, because possessed of a general power to sign drafts, may draw drafts of the bank in favor of his individual creditor, and it is to be said that "there is nothing unusual or suspicious in this way of making the draft payable to the creditor of the cashier or president who draws it," then in Claflin v. Bank, 25 N. Y. 293, for all we can see, it might just as well have been said that there was nothing unusual or suspicious in the acceptance or certification by the president of the bank of a check or draft drawn by himself. The power of such an officer to draw drafts of his bank upon others is no greater than his authority to accept the checks or drafts of others upon his bank; yet in that case it was held that the general authority of the president of the bank to certify checks drawn upon it did not extend to checks drawn by himself, and it was declared not to be necessary for the principal in such case to show that the agent had acted unfairly or that he himself had sustained an injury, but that the act of the agent is deemed to be unauthorized, and the contracts void.  We agree with counsel for the defendant in error that the concern of the courts should not be to make it easy for persons in fiduciary positions to make way with that which is committed to their care, by relaxing this salutary rule, through considerations of the supposed necessities of business and commerce, and that the rule should not be suspended,

where the opportunities for breach of trust are largest, merely because they are large. The best public policy requires that bank officers be rigidly held to the ordinary and well-understood rule. There is, we believe, no good reason to the contrary.

In the first case, where there was a trial by jury and a general verdict, reference is made to Cassatt's own testimony for proof that he "had authority to draw drafts to his own or his creditor's order, upon payments by him to the bank for the same," and on this assumption, it is contended, on the authority of Hanover Nat. Bank v. American Dock & Trust Co., and like cases, that the fact of drawing the drafts was a representation, on which the plaintiffs in error had a right to rely, that such payments had been made. Whether he had such authority was a question of fact, of which the verdict is conclusive, unless material error of law occurred at the trial. The testimony referred to is quite indefinite and uncertain, but, if it affords ground for an inference that Cassatt did in fact draw drafts to his own order, or in favor of his creditors, it shows no basis whatever for a belief that he did so with the knowledge of other officers of the bank. In the case last referred to there was proof that the president of the warehouse company had issued receipts to himself before the one in question, and there was evidence of facts and circumstances, sufficient to go to the jury, tending to show that he had authority to do so. It being apparent on the face of the drafts here in question that they were drawn upon the funds of the bank, it was impossible for the plaintiffs in error to receive them in discharge of Cassatt's individual obligations to themselves without being put upon inquiry whether the president had in fact the authority which he assumed to exercise; and it was not enough to make inquiry of him, nor permissible to rely upon the implied representation deducible from the execution of the drafts. That the execution of the drafts by the president of the bank in his own interest was without authority, and that the plaintiffs in error were not, and could not have been, innocent holders, the evidence was without conflict, and so clear that the court might have directed a verdict in favor of the plaintiff; and on this view of the case the other questions discussed, which in themselves are of minor importance, lose all significance. It is said that "the question of gambling was an issue in the case," and the refusal of a special request for instruction on the subject, it is urged, was material error. No such issue appears in the pleadings, and no mention of the subject is found in the court's charge to the jury. In fact, however, by necessary implication, the question was excluded from consideration when the jury was told that the plaintiff could recover only upon proof that Cassatt, without the authority, knowledge, consent, or acquiescence of the board of directors of the bank, misapplied the moneys of the bank in question to his own use, and that the defendants had knowledge, or were aware of such facts as would amount to knowledge on their part, that he was so misapplying the money of the bank; and the statement that the defendants must have had such knowledge was repeated in substantially the same words and with equal clearness in a separate charge. In short, the controlling question was fairly sub-

mitted to the jury, and, it is clear, was rightly decided. The allowance of interest was proper.

The judgment in each of the cases is affirmed.