THE FIRST NATIONAL BANK OF KINGMAN, KANSAS,
v. JOHN BYRNES.

**No. 11,460.**   (59 Pac. 1056.)

1. TRUSTS AND TRUSTEES — *Misappropriated Funds.*   A person is
not responsible for the misappropriation of trust funds by a trus-
tee unless he knowingly participates or aids in committing the
breach of trust.

2. ———— *Bank Cashier — Commission Agent not Responsible.*
Where such person, without knowledge or notice of the miscon-
duct and misappropriation of money by a cashier and teller of a
bank, forwards drafts, wrongfully issued by that officer for per-
sonal purposes, to a commission company in another city, and is
paid by the company a small commission as compensation for that
service, he is not responsible to the bank for the misappropriated
funds.

3. ———— *Certain Funds Held not Impressed with a Trust.*
The fact that a part of the funds deposited by such person and
sought to be reached by the bank was received by him from the
commission company is not sufficient to impress them with a
trust in favor of the bank, or to make him liable as its trustee.

Error from Kingman district court ; P. B. GILLETT,
judge.   Opinion filed February 10, 1900.   Affirmed.

STATEMENT.

THIS is an action by the First National Bank of
Kingman, Kansas, for the delivery and cancelation
of six certificates of deposit of $1000 each, payable to
the order of John Byrnes, which, it was alleged, were
fraudulently obtained, and were the proceeds of money
embezzled from the bank by R. L. Hanscome while
acting as cashier and teller of the same.   It was al-
leged and claimed that the defendant Byrnes knew of
the misappropriation of the money by Hanscome,
and cooperated with him in abstracting the funds of
the bank, a portion of which was represented by the
certificates of deposit.   The defendant denied any
such knowledge, participation, or wrong-doing, and

at the trial the court made the following findings of fact and conclusions of law:

"1. The plaintiff, the First National Bank, is now and for more than fifteen years last past has been a corporation under the U. S. banking law, and for five years last past W. E. Maynard has been its president, A. C. Tredick its cashier, and until July 11th, 1898, and for five years prior thereto, R. L. Hanscome has been its assistant cashier and teller (part of this time assistant cashier and part of the time teller).

"2. That the defendant, John Byrnes, is and for more than five years last past has been the agent and operator of the Western Union Telegraph Company, at Kingman, Kan., and also the agent of the Pacific and U. S. Express Companies."

"4. That the said cashier and teller, R. L. Hanscome, during the time hereinbefore mentioned had full power and authority to draw on the plaintiff's correspondents at Kansas City and other places.

"5. That during said time the First National Bank of Kansas City, Mo., the Hanover National Bank of New York, the National Bank of Commerce of Kansas City, Mo., and the Fourth National Bank of Wichita, Kan., were correspondents of plaintiff.

"6. That during the year 1897 and up to May 9th, 1898, the W. A. Michael Commission Co., was a commission house in Kansas City, Mo., engaged in the buying and selling for customers grain, stocks, etc. On May 9th, 1898, this house failed.

"7. That on the 11th day of July, 1898, R. L. Hanscome absconded, being then indebted to the First National Bank in the sum of about $41,000 which he had improperly taken from said bank, and only about $5000 of that sum has been repaid.

"8. That the said R. L. Hanscome began misappropriating the funds of the bank as far back as the year 1895, and continued in said practice from time to time, until about the time he absconded, July 11, 1898.

"9. That during the year 1897, and part of the year 1898, R. L. Hanscome speculated largely in grains

through the W. A. Michael Commission Co., using
for such purpose the funds of the plaintiff, which he
had abstracted as aforesaid.   Other persons also spec-
ulated in grain through said commission company
during this time, but none of these speculators used
their names.    They used numbers instead.    R. L.
Hanscome had two numbers, number 1, and number
51.    There were from fifteen to twenty of these num-
bers, representing speculators.

"10.   That the court is unable to state whether or
not R. L. Hanscome represented a syndicate composed
of several persons, or traded for himself alone, but the
court finds that the said R. L. Hanscome represented
to John Byrnes and many others, that in his specula-
tion he was representing a syndicate, and that John
Byrnes believed this to be true.

"11.   That the said R. L. Hanscome carried on his
speculations in grain in the following manner : He
would go to the defendant, John Byrnes, and direct
him to wire the commission company to purchase or
sell for him, at a given price, so many bushels of
wheat.    These messages were transmitted by the said
John Byrnes the same as other messages were.   If the
order was to buy grain the said Hanscome would de-
liver to the defendant a draft for the amount to be
invested by him, and in all cases the said drafts were
signed by R. L. Hanscome as teller or cashier.   These
transactions were carried on in a general way, said
Hanscome keeping to his credit with said commission
company a general balance so that he could wire a
purchase and pay for it out of his general balance to
his credit.    These drafts that were drawn by the said
Hanscome were made payable to John Byrnes, and
often included sums of money sent by other specula-
tors, and the credits were made by the commission
company to the account of the several speculators as
directed by the defendant in his letters or messages of
instruction.

"12.   That the said John Byrnes always transmitted
the full amount of drafts delivered to him by said
Hanscome to commission company, never retaining
any part thereof.

" 13.  That when the said R. L. Hanscome began to speculate in grains, and for a long time thereafter, the said John Byrnes received no compensation for his services, other than the price of the message sent, but later the business increased, and the number of speculators became so great that the said Byrnes informed the commission company that he would not longer attend to the business without compensation, and during the month of August, 1897, an arrangement was made by which the commission company paid the said Byrnes 1.8 cents per bushel for all grain bought and sold through him, regardless of who the purchasers or sellers might be, and this arrangement continued from that time forward, and the said Byrnes receiving his check for commission the first of each month.

" 14.  That no time during the speculations herein referred to were R. L. Hanscome and John Byrnes partners.

" 15.  That the six certificates of deposit involved in this action were issued by the plaintiff to the defendant for money and checks and drafts, the property of the defendant, and that none of the funds of the plaintiff are included in them or any of them, and that the plaintiff has failed to trace any of the funds represented by the said certificates of deposit, so that they can claim the same in this action.

" 16.  That R. L. Hanscome was the bookkeeper and kept the books of said First National Bank during all the time he was employed by it, and that he made changes in statements sent by plaintiff's correspondents by erasures or by adding additional figures to conceal his fraudulent transactions, and that these alterations and erasures were skilfully made.

" 17.  That said R. L. Hanscome would indicate on the stub of the draft register of said bank a certain sum, as the amount of said draft, but in drawing the body of the draft would make it call for a larger sum, in several instances the stub showing $1.50 and the draft with corresponding number being drawn for $1,500.

" 18. That R. L. Hanscome was receiving a salary of $65 per month from the plaintiff.

" 19. That plaintiff during 1897 and 1898 kept large balances to its credit in its correspondent banks in Kansas City, Mo., New York, N. Y., and Wichita, Kan.

" 20. That at the time defendant took out the certificates of deposit set out in the first, second, third and fourth. causes of action, checks drawn by the W. A. Michael Commission Co. upon the National Bank of Commerce of Kansas City, Mo., in favor of John Byrnes for payment of his commission for services were turned in and indorsed by him as part consideration of said certificates of deposit.

" 21. That checks of the W. A. Michael Commission Co., drawn on the National Bank of Commerce of Kansas City, Mo., in favor of John Byrnes, and indorsed by him in payment for his commission for services were presented by him as part consideration for each of the certificates of deposit set out in the fifth and sixth causes of action."

#### CONCLUSION OF LAW.

" 1. That the plaintiff is not the owner of the certificates of deposit set forth in its petition or the funds represented thereby, and that said certificates of deposit are not impressed with a trust in favor of the plaintiff, and that the injunction issued herein should be dissolved, and this cause dismissed at cost of plaintiff."

Judgment was accordingly given for the defendant, and the plaintiff alleges error.

*John E. Lydecker*, and *Peters & Nicholson*, for plaintiff in error.

*W. M. Wallace*, and *W. M. Whitelaw*, for defendant in error.

The opinion of the court was delivered by

JOHNSTON, J. : The record shows beyond controversy the fraud of Hanscome and the embezzlement of the

money of the bank by him while acting as its cashier
and teller, and that a large part of the money em-
bezzled was used in his grain speculations with the
W. A. Michael Commission Company.   It further ap-
pears that the propositions of Hanscome to buy and
sell, as well as the money used in the transactions,
were forwarded to the commission company through
Byrnes.   It appears, too, that Byrnes received com-
pensation from the commission company for his serv-
ices in this respect, and that a portion of the money
deposited or represented by the certificates sought to
be canceled was obtained from the commission com-
pany by him as such compensation.   The weakness
of the position of the bank is that it failed to establish
the complicity of Byrnes in the frauds of Hanscome.
As a general principle, all persons who knowingly
participate or aid in committing a breach of trust are
responsible for the wrong and may be compelled to
make good the loss.   An effort was made by the plain-
tiff to show that Byrnes knowingly cooperated with
Hanscome in the misappropriation of the bank's
money, and was in fact a partner of his in these deal-
ings, but the findings are against it on both of these
contentions.   If Byrnes did not know of the fraud of
Hanscome, or that he was wrongfully using the money
of the bank, he is no more responsible for the loss
than any innocent stranger through whose agency the
misappropriated funds were invested.

It is contended that the court erred in finding that
Byrnes believed that Hanscome represented a syndi-
cate.   It appears from the evidence that Hanscome's
dealings with the commission company were large —
that is, that large drafts of money were forwarded by
Hanscome through Byrnes to the commission com-
pany ; that the salary of Hanscome was small, and

that the property owned by him was quite limited in value. From these and other facts it is claimed that Byrnes must have known that Hanscome was using the money of the bank. The court, however, found, and there is testimony to sustain the finding, that Hanscome represented to Byrnes and to many others that in his speculations he was representing a syndicate, and that Byrnes believed this representation to be true. The testimony of Byrnes himself and one other witness supported the finding, and we see no reason why this testimony should be ignored.

Another objection is that the court erred in finding that Byrnes and Hanscome were not partners, but a reading of the record satisfies us that this finding is abundantly sustained by the testimony.

The remaining contention, that the funds represented by the certificates of deposit belonged to the bank, or were impressed with a trust in favor of the bank, must be determined upon the facts found by the trial court. Much of the argument is an attack upon these findings and the weakness of the testimony; but whatever might have been our view of the facts as an original proposition, we find testimony to support the findings, and they are therefore conclusive in this inquiry. As cashier and teller of the bank, Hanscome was authorized to draw drafts, and it appears that the exchange purchased by the patrons of the bank was signed by him in his official capacity. The fact that he was abusing his trust and wrongfully using the funds of the bank for personal purposes was not easily ascertained by outsiders. Hanscome himself operated under two numbers, and the drafts which were issued were intended to and did cover the dealings of others than Hanscome. Aside from this fact, there is the further one that Hanscome had represented to Byrnes

30—61 KAN.

that a syndicate of persons were operating under his numbers, and that this representation was believed by Byrnes. Of course, if Byrnes knew that the money was abstracted from the bank, as the plaintiff claims, he could acquire no title to it, but the findings are to the effect that he had no such knowledge; and if he believed the representations of Hanscome, as the jury found he did, there is nothing in the facts inconsistent with his good faith. The transactions, as will be observed, were with the commission company, which is not a party to this proceeding, and the remittances were all forwarded to and received by that company. The drafts, or some of them, were made to Byrnes, but they were delivered to him for transmittal to the company and immediately forwarded in accordance with the intention and request of the dealing parties. There is a specific finding that no part of the drafts or funds left with him for transmittal to the company was ever retained or used by him.

It is said that the form and character of the drafts were notice to him, and that the transmittal of such drafts to the company through him was at his peril. In support of this contention, *Lamson v. Beard*, 36 C. C. A. 56, 94 Fed. 30, 45 L. R. A. 822, is cited. That was an action by a bank to recover from brokers the proceeds of drafts which the president of the bank drew on the funds of the bank without authority. It was held that the brokers, by the acceptance of the drafts, became parties to their original execution, and hence were put on inquiry as to the authority of the president to draw them, and if the authority was exceeded they might be liable to the bank for the proceeds of the drafts received by them. This rule, it would seem, carries the doctrine and effect of implied notice to a questionable extent; but assuming it to be

correct, it does not control the decision of the case in hand. This action is not brought to cancel the drafts which were issued to be sent to the company, nor is it brought to recover from the company the proceeds of the drafts which it received. It is brought against one whose position is one remove from that occupied by the parties who received the proceeds of the drafts wrongfully issued. Byrnes, who innocently forwarded the drafts, and who retained no part of them, does not occupy the position of the brokers in the cited case. The fact that some of the commission earned by Byrnes formed a part of the deposit represented by the certificates in question does not give them the character of trust funds. Where the funds were derived from, which the company forwarded and paid to Byrnes, is not shown in the record, and the fact that some of the funds in the hands of the commission company may have had the character of trust funds is not a sufficient tracing or identification of the trust funds to make Byrnes liable as trustee of the bank.

The judgment of the district court will be affirmed.