## GALE v. CHASE NAT. BANK.

(Circuit Court of Appeals, Second Circuit. July 5, 1900.)

### No. 156.

1. BANKS—POWERS OF CASHIER—CERTIFICATION OF CHECK DRAWN BY HIMSELF.

The cashier of a bank has no authority, by virtue of his office, to bind the bank by a certification of his own individual check drawn thereon; and, as in this case he had neither real nor apparent authority, the certification was invalid.

2. PAYMENT—MONEY OBTAINED ILLEGALLY—RECOVERY BY OWNER.

A creditor who receives payment of his debt in money in due course of business, and in good faith, cannot be required to repay the money to one from whom the debtor illegally obtained it.

3. BANKS — POWERS OF CASHIER — DRAFT ISSUED IN PAYMENT OF INDIVIDUAL DEBT.

The cashier of a bank, as such, has no authority to issue cashier's drafts to his own order in payment of his individual debts, and a creditor accepting a draft so drawn takes the risk of such lack of authority.

4. SAME—EVIDENCE TO ESTABLISH IMPLIED AUTHORITY.

To warrant a finding that the cashier of a bank had implied authority to issue cashier's drafts to his own order in payment of his individual debts, such as will bind the bank and protect a creditor in accepting a draft so drawn for a sum so large as to be out of the usual line of conduct in the banking business, a settled course of business must be shown, by which he was permitted, with the acquiescence of the directors, to exercise such authority during a series of years or in numerous transactions; and evidence that he had drawn not exceeding nine drafts in all in payment of his own debts, only four of which were to his own order, and all of which were issued within the preceding six months, is insufficient.

In Error to the Circuit Court of the United States for the Southern District of New York.

E. B. Whitney, for plaintiff in error.

George A. Strong, for defendant in error.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. Gale, as receiver of the Elmira National Bank, which became insolvent in May, 1893, brought in the circuit court for the Southern district of New York an action at law against the Chase National Bank, a national banking association established in the city of New York, upon the cause hereinafter stated, which action resulted in a verdict of the jury for the defendant. This writ of error was brought by the plaintiff below to review the judgment which was entered upon the verdict. The transaction between the Elmira Bank and the defendant was, as stated in the charge of the presiding judge, as follows:

"Mr. J. J. Bush was the cashier of the Elmira National Bank. He had borrowed money of the Chase National Bank, and given his note for $25,000, payable at the Chase National Bank, and secured by the stock of the Elmira National Bank. This note had been reduced by payments to $15,000. On the 4th day of May, 1893, the officers of the Chase National Bank telephoned to Bush that his collateral was unsatisfactory, and asked him to come down and settle the matter up. Mr. Bush came in response to this telephone message on the morning of May 5, 1893, bringing with him $8,000 in money and a draft of the Elmira Bank on the Quaker City Bank of Philadelphia for $7,000, which was originally made either to the order of Bush individually or

as cashier. \* \* \* Bush said that with this money and draft he wished to take up his $15,000 note. Mr. Porter, the vice president of the bank, objected to the $7,000 draft on Philadelphia, as there was some considerable delay with collections from Philadelphia, something of a panic in the money market, and some uncertainty about collections from Philadelphia banks. He said that, as they wanted to use funds, and Philadelphia funds were not available to pay this loan, which was payable at the Chase National Bank, and therefore payable in New York funds, a different arrangement should be made. Mr. Porter asked Mr. Bush if he had a personal account with the Elmira National Bank, and he said he had. Porter then suggested to him that he (Bush) should put the money to the credit of the Elmira National Bank, and the $7,000 draft in its collection account, and make a personal draft for $15,012.50, the amount of the note and interest, on the Elmira Bank, payable at the Chase National Bank, so that it would be in New York funds. Mr. Voorhees, one of the clerks in the Chase National Bank, then brought the form which is ordinarily used in making such a draft; and Mr. Porter made it out, and Bush signed it individually as maker, and certified and accepted it as cashier, and left the $7,000 draft and the money."

Whether the $7,000 draft was originally made to the order of Bush as cashier was a matter in dispute. Bush testified that it was so drawn. Porter testified that, when Bush indorsed the draft as cashier, he called Bush's attention to the fact that it was made payable to him individually, whereupon he added "Cashier" to his name as payee. The plaintiff is of opinion that the question, whether or not actually decided by the jury, must be regarded as settled by the verdict in favor of the defendant's version of the transaction. The check for $15,012.50 was immediately charged to the Elmira Bank, and the currency was credited to it. The $7,000 Quaker City draft was nominally taken for collection, and was collected and credited to the Elmira Bank on May 8th. The note and collateral were left with the defendant. No notice of the transaction was given by Porter to the Elmira Bank, but the charge of $15,012.50 appeared on the defendant's account rendered June 6, 1893, to the receiver, who brought the suit to recover that amount. The $8,000 in currency were embezzled by Bush from the Elmira Bank, and the use of the $7,000 draft was also an embezzlement. His account with the bank on May 4th was overdrawn. If the transaction rested entirely upon the fact that Porter received this certified check for $15,012.50 in payment and discharge of Bush's individual debt, there would be no doubt as to the illegal character of the transaction, and of its invalidity as against the Elmira Bank. Porter took in payment of Bush's debt his individual check upon the Elmira Bank, payable at the Chase Bank, which was certified by Bush as cashier; the certification being in violation of section 5208 of the Revised Statutes. The trial judge charged that there was no evidence tending to show that Bush had any real or apparent authority for the certification, or to make the check payable at the office of the defendant. The certification was invalid because it was the certification of the cashier's individual check, given and received for his individual benefit, with no authority either to certify it, or to make it payable elsewhere than at the office of the Elmira Bank. The validity of the certification by the president or cashier of a bank of his individual check was examined by Chief Justice Selden in Claflin v. Bank, 25 N. Y. 293,—a well-known case, in which it was held that the acceptance or the certification of the president's indi-

vidual check by the president was void, irrespective of the question whether he had funds in the bank to meet it; for he could not act in regard to the same check in two capacities,—both as drawer and as agent to bind the bank to its payment. While this is true, yet, if Bush had, at the time when this unauthorized and therefore void certification was made, deposited with the defendant an equal amount of his own funds to meet the check, the Elmira Bank, having lost nothing by the transaction, could not recover the amount of the deposit from the defendant. In that case Bush would have deposited $15,012.50 of his own funds to the credit of the Elmira Bank, and have drawn the same amount to pay his note to the Chase Bank,— a transaction which, while it would have been irregular, would not have injured the Elmira Bank. The real defense is not that the certified check created a liability against the Elmira Bank, or that either the money or the $7,000 draft was the property of Bush, but that the transaction was, though in form a payment by certified check, actually a payment of the face of the note with the currency and the Quaker City draft, and that the money could not be recovered, although stolen by Bush from the Elmira Bank, because received by the defendant in good faith, and that the amount of the draft could not be recovered, because Bush had implied authority to use cashier's drafts to his own order in payment of his individual debts. The money was, without question, taken by Bush from the vault of the Elmira Bank without authority, and was its property; but if received by the defendant in due course of business, in good faith, and for the payment of a valid debt, the defendant is not subjected to the risk of repayment to the person from whom it was illegally obtained. Stephens v. Board, 79 N. Y. 187; Holly v. Society, 34 C. C. A. 649, 92 Fed. 745.

The remaining question in the case was in regard to the authority of Bush to draw a cashier's draft for $7,000 upon the Quaker City Bank to his own order in payment of his own individual debt, and thus embezzle the funds of the Elmira Bank. The question turned, not upon an express authority on the part of Bush, but upon an implied authority, which was to be inferred from the alleged acquiescence of the Elmira Bank in his prior assumption of authority. That, in the absence of any authority in a cashier to draw cashier's drafts to his own order in payment of his individual debts, the person who receives such a draft in payment of the cashier's individual debt takes the risk of being obliged to repay the draft to the bank, was not denied. Bank of New York Nat. Banking Ass'n v. American Dock & T. Co., 143 N. Y. 559, 38 N. E. 301; Hanover Nat. Bank v. Same, 148 N. Y. 612, 43 N. E. 72; Corn Exchange Bank v. Same, 149 N. Y. 174, 43 N. E. 915; Anderson v. Kissam (C. C.) 35 Fed. 699; Lamson v. Beard, 36 C. C. A. 56, 94 Fed. 30. The cases proceed upon the line of reasoning in the Claflin Case, supra, and, therefore, if a cashier has no authority to issue a cashier's draft to his own order in payment of his own debt, the creditor who receives such a draft in payment "takes the risk" of the cashier's lack of authority, although he may have had individual funds upon deposit. If the cashier had express authority to issue cashier's drafts to his own order upon the same

terms upon which he could issue them to an individual (that is, upon payment therefor), two New York cases hold that the creditor is justified in receiving such a draft, although it was issued fraudulently. Goshen Nat. Bank v. State, 141 N. Y. 379, 36 N. E. 316; Hanover Nat. Bank Case, supra. The trial judge charged in accordance with these general propositions, and said:

"But this general authority as such general agent of the bank to draw drafts or checks on the bank in the conduct of its business does not, by itself, permit him to draw such drafts or checks in payment of his personal debts, or to raise money for the transaction of his personal business. Where, therefore, as in this case, he draws a draft or check on the bank, payable to his own order, and for his individual debt, the party acting thereon takes the risk that the agent or the cashier may act without authority to do so. But if it appears that the agent had repeatedly done such acts on previous occasions, and that such acts had been ratified, and not repudiated, by the officers of the corporation, then, providing such acts have been done for a period sufficiently long to establish a settled course of business, it may be inferred, from the general manner in which they have been done, that such acts were known, or ought to have been known, by the directors, and that the cashier had authority to do such acts. If that be shown, the bank is liable. The authority to make such personal use of the funds of the bank may be shown, therefore, by the long-continued doing of such acts under such circumstances as warrant the inference that the acts were known and authorized by said bank; that is, the authority of the cashier may be inferred from the power he was accustomed to exercise without the dissent of the bank, and with its acquiescence."

He further charged:

"If you find that Bush had no implied authority to use the funds of the bank in this way, then your verdict as to the $7,000 and interest should be for the plaintiff."

The charge upon this point was in accordance with the views of the supreme court, as expressed in Martin v. Webb, 110 U. S. 7, 3 Sup. Ct. 428, 28 L. Ed. 49, in which it is said that the authority of a cashier "may be inferred from the general manner in which, for a period sufficiently long to establish a settled course of business, he has been allowed, without interference, to conduct the affairs of the bank. It may be implied from the conduct or acquiescence of the corporation, as represented by the board of directors. When, during a series of years, or in numerous business transactions, he has been permitted, without objection, and in his official capacity, to pursue a particular course of conduct, it may be presumed, as between the bank and those who in good faith deal with it upon the basis of his authority to represent the corporation, that he has acted in conformity with instructions received from those who have the right to control its operations." The authority is to be implied from the acquiescence of the directors in permitting the officer, during a series of years or in numerous business transactions, to pursue a particular course of conduct; and their acquiescence is derived from their actual knowledge, or from what should have been their knowledge, of the conduct or course of business of the officer. In a case of this sort, in which a cashier's use of the bank's funds, and assumption of authority to use the bank's name for his individual benefit, was so much out of the line of the ordinary conduct of a cashier that it would seem that its unusual boldness would have prevented him from making the attempt, we are of opinion that clear proof should be required to satisfy a jury that

the directors had, by their long or frequent acquiescence or laches, permitted him to exercise authority which directly leads to embezzlement. A defendant cannot be permitted to shield itself under the implied authority of a cashier to embezzle the funds of the bank, without clear and satisfactory proof that such implied authority existed. The question upon this part of the case is whether there was adequate evidence upon which the fact of implied authority could be affirmatively found; for, unless it could be affirmatively found, the draft was upon its face no protection to the defendant. The form of procedure by which it was received, nominally for collection for the Elmira Bank, and really, when collected, in part payment of Bush's note, was no protection. It was proved that in 1892 Bush, as cashier, drew three checks, amounting to $1,000 in all, upon the National Bank of North America, in favor of himself, individually. It does not appear whether on these occasions his account with the Elmira Bank was overdrawn. In 1893 he, as cashier, drew drafts upon the defendant as follows: One for $77.50, to his own order, in payment of interest upon his note for $25,000; one for $500 to the order of a life insurance company; one to order of the defendant for $77.50, for interest; one for $300 in favor of the Central Trust Company; and one for $75 to the order of the defendant, for interest. The life insurance company and the Central Trust Company were creditors of Bush. In 1893 he drew a cashier's draft for $600 upon the Hide & Leather Bank to the order of M. L. Grieder, an individual creditor. In 1893 he drew a check upon his personal account in the Elmira Bank for $250 to pay for drafts upon some other bank, but by whom the drafts were signed does not appear; and in 1893 he drew a check upon his personal account in the Elmira Bank for $90 to pay for a draft upon the Hide & Leather Bank. Who signed the draft does not appear. The assistant cashier was in the habit of signing drafts upon correspondent banks. In March, 1893, he drew two cashier's drafts upon the defendant for $228.50 to the order of H. K. Bush Brown, his brother, as a loan to him, and a cashier's draft upon the defendant to the order of one Jenkins for $257.50, also as a loan to his brother. He paid for these drafts by his personal check upon an overdrawn account; and in May, 1893, he drew a cashier's draft upon the Quaker City Bank for $100 to the order of his brother, which was also a loan, but paid by his own personal check upon his overdrawn Elmira Bank account. It thus appears that in 1892 three cashier's checks were drawn to the order of Bush upon the Bank of North America for $1,000 in all, and in 1893 one cashier's draft for $77.50 was drawn upon the defendant to the order of Bush, and two cashier's drafts were drawn upon the defendant to its order,—one for $75, and the other for $77.50. In the same year three drafts were drawn by Bush, as cashier, upon correspondent banks, for $1,400, to the order of his creditors. The cashier's drafts, not known to have been drawn by Bush, were not material to this issue; and we do not regard the drafts drawn in favor of Brown or Jenkins as of importance, because the question is in regard to Bush's course of business, which was known, or ought to have been known, by the directors of the bank. The argument of the defendant is that, if the audit-

ing committee had searched the history of the Brown and Jenkins drafts, it would have been discovered that they were loans by Bush or by the bank to Brown, which had been paid by Bush's personal checks. These drafts were on their faces apparently the ordinary cashier's drafts in favor of a third person, which are constantly issued to a depositor or to a purchaser. An auditing committee is not required to search into the history of each draft of that class, beyond the fact that payment has been made therefor. This course of conduct, from which implied authority is to be inferred, began in October, 1892, and ended in May, 1893, and consisted of nine drafts, five of them to the order of creditors, all amounting to $2,630. This evidence is very far from being adequate to show a settled course of business "during a series of years," or "in numerous business transactions," whereby Bush was permitted to draw cashier's drafts to his own order, and use the funds of the bank for his own personal benefit. It is too weak to establish an implied authority to do the thing which Bush boldly undertook to do by a misuse of his position and opportunity as cashier. There was no evidence in the case that Porter did in fact rely and act upon this supposed course of conduct of Bush, and therefore no estoppel in pais was created upon the plaintiff, as the representative of the Elmira Bank. Bloomfield v. Bank, 121 U. S. 125, 7 Sup. Ct. 865, 30 L. Ed. 923.

The plaintiff requested the court to direct the jury to find a verdict for the plaintiff in at least the sum of $7,000 and interest. The court refused to charge as requested, to which refusal the plaintiff excepted. Upon the evidence in the case, a verdict should have been directed in favor of the plaintiff to recover $7,000 and interest, in the event of a finding by the jury that he was not entitled to the entire sum in controversy. The judgment is reversed, with costs, and the case is remanded to the circuit court, with instructions to set aside the verdict and order a new trial.