HARWOOD v. FT. WORTH NAT. BANK. (No. 8852.)

(Court of Civil Appeals of Texas. Ft. Worth. May 18, 1918. Rehearing Denied June 22, 1918.)

1. CORPORATIONS ⬳430—OFFICERS—POWERS —ADVERSE INTERESTS.

It is a general rule that an officer whose interests are adverse cannot bind the corporation except as to innocent parties, nor are acts of manifest bad faith on the part of the officer binding on the corporation, and strangers who

participate in such wrong against the corporation may not profit thereby.

**2. BANKS AND BANKING ☞309—ACTS OF OFFICERS—QUESTIONS FOR JURY.**

In action by savings bank receiver to recover from national bank proceeds of drafts drawn in plaintiff's name at the direction of its president, which proceeds were received and applied on a claim against the president individually, evidence *held* to present jury question whether defendant's officers were charged with knowledge that such president had not arranged to take up the drafts and that his acts in regard thereto were unauthorized.

**3. CORPORATIONS ☞426(7) — ACTS OF OFFICERS—RATIFICATION.**

The assent or approval of a corporation to acts done on its account may be inferred in the same manner that the assent of a natural person may be, and where a corporation, with full knowledge of the unauthorized act of its officers or agents, acquiesces therein, it thereby ratifies them, especially where the acquiescence results in prejudice to a third person.

**4. ESTOPPEL ☞119—QUESTIONS FOR JURY.**

In action by a savings bank receiver to recover from national bank proceeds of drafts drawn in the name of the savings bank, used by the national bank in discharge of individual liability of the president of the savings bank to it, it being disputed whether the acts of the president were beyond his powers, the question whether the receiver was estopped to recover from the national bank by failure to pursue other assets of the president of the savings bank *held*, under the evidence, for the jury.

Appeal from District Court, Tarrant County; Ben M. Terrell, Judge.

Action by Brown Harwood, as receiver of the Ft. Worth Savings Bank & Trust Company of Ft. Worth, against the Ft. Worth National Bank. Judgment on peremptory instruction for defendant, and plaintiff appeals. Reversed and remanded.

Flournoy, Smith & Storer, of Ft. Worth, for appellant. Ross, Ross & Alexander and Slay, Simon & Smith, all of Ft. Worth, for appellee.

BUCK, J. The receiver of the Ft. Worth Savings Bank & Trust Company of Ft. Worth, hereinafter called Savings Bank, filed this suit to recover of the Ft. Worth National Bank $50,000, with interest, the proceeds of two certain drafts of date April 10, 1914, drawn in the name of the Savings Bank on funds of said last-named bank in the hands of correspondent banks named as drawees in said drafts, and made payable to the Ft. Worth National Bank, which drafts and the proceeds thereof were by defendant received and applied on a claim of liability of E. E. Baldridge, president of the Savings Bank, individually, to the Ft. Worth National Bank. The petition alleged that the drawing of the drafts and the use of the proceeds thereof constituted a fraudulent appropriation of the funds of the Savings Bank for the use of Baldridge, that there was no consideration to the Savings Bank for said use, and that the Ft. Worth National Bank had both actual and constructive notice that the pay-

ments so made out of the funds of the Savings Bank were without authority and not binding on the Savings Bank, and said $50,000, under the circumstances, represented money had and received by the Ft. Worth National Bank for the use and benefit of the Savings Bank. Defendant pleaded a general denial, estoppel, stale demand, ratification, laches, and that it was and became, upon the receipt of said drafts, a holder in good faith and for a valuable consideration without notice of any infirmity in same. From a judgment, upon peremptory instruction, in favor of defendant, the plaintiff has appealed.

The facts are largely undisputed. About January 1, 1912, Baldridge became president of the Waggoner Bank & Trust Company, whose name was by charter amendment subsequently changed to the Ft. Worth Savings Bank & Trust Company. It was engaged in the business of inviting and receiving savings deposits, lending money on notes and securities, rediscounting its paper through banking correspondents, borrowing money, and, in a limited degree, carrying on a general banking business. The Savings Bank had and kept a regular set of books, such as banks usually keep. There were other stockholders in the bank, but just exactly who they were or how much stock they owned at the time of this transaction is not made very clear in the statement of facts. However, it is agreed that at this time, and for some time prior to April 10, 1914, and up to the closing of the bank, July 3, 1915, Baldridge owned practically all the stock, and was the actual manager of and controlling authority in the bank's affairs. Some time before this T. M. Presley had been made vice president, and A. C. Alexander cashier, by Baldridge's direction, but these two in fact did not exercise and did not attempt to exercise any controlling authority. Their services were largely of a clerical nature, and they were under the direction of Baldridge in the exercise of their official functions, he being the dominating influence in the management of the affairs of the bank.

The appellee had been for some time before, and was at the time of and subsequent to the transaction in question, the clearing agency of the Savings Bank, which latter was not a member of the Clearing House. All checks on the Savings Bank were charged by the Clearing House to appellee, and the latter later presented them to the Savings Bank for payment. In January, 1914, representatives of the appellee, acting for it, entered into an arrangement with Baldridge, then president of the State National Bank, a banking corporation of Ft. Worth, by which it was agreed that the appellee should take over the liquidation of the State National Bank, on terms specified, for the protection of the shareholders and depositors of the latter bank, and as a consideration for

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

such undertaking Baldridge agreed to transfer to persons identified with the ownership and management of the appellee bank all the capital stock of the Savings Bank, under a plan by which enough of the assets of the Savings Bank to protect the depositors, the deposits being estimated at about $800,000, would be transferred to the new control, and out of the remainder Baldridge was to compensate himself for his stock so to be transferred. The appellee was to declare a dividend, out of its undistributed surplus earnings, to its stockholders, and invite its stockholders to invest this dividend in Savings Bank stock. Steps were taken by appellee's director to put this plan into effect, and at the request of Baldridge the directors of appellee agreed to increase its capital stock by an addition of 1,000 shares, at par value of $100, and this new stock should be sold to Baldridge and his associates in the State National Bank at $320 a share. Under this agreement Baldridge paid for 425 shares of appellee's new stock at $320 a share, and the liquidation of the State National Bank was in progress on April 10, 1914. In January, 1914, Baldridge was elected a vice president of the appellee bank, and held this position on the date when the drafts in controversy were drawn, he resigning therefrom April 22, 1914. One of the leading inducements to the appellee to undertake the liquidating agency was the transfer of the Savings Bank stock, charter and assets. Appellee desired to have a savings department in connection with its regular banking business, and the patronage gained from the purchase of a savings bank already established was deemed of considerable value. The appellee agreed to advance money at once to pay the depositors of the State National Bank, to pay the expenses of the liquidation, etc. After appellee's directors had accepted the liquidation of the State National Bank, Baldridge concluded he did not want to transfer the Savings Bank stock, charter, etc., and asked to be relieved of that part of the contract. After some delay, and with some reluctance on the part of some of appellee's officers and directors, an agreement was finally reached by which Baldridge was permitted to keep the stock, charter, etc., of the Savings Bank, and to pay appellee in consideration thereof the sum of $50,000. The deal, under the changed contract, was consummated on April 10, 1914. At this time certain of the officers of appellee bank went to the building where the Savings Bank operated, and there agreed to accept Baldridge's last proposition, and to accept the $50,000 in lieu of the surrender of the Savings Bank's stock. The meeting was held in a room or balcony overlooking the counting house or offices where the business of the Savings Bank was conducted. Upon the consummation of the agreement, Baldridge called T. M. Presley from his duties below, and instructed him to draw two drafts, of $25,000 each, upon two corresponding banks, one on a New York bank, and the other on a St. Louis bank, and also to draw on the Savings Bank a draft in favor of the State National Bank of Ft. Worth for some $299,000. These drafts were prepared by Presley, who signed them as vice president of the Savings Bank. The $299,-000 was a payment by the Savings Bank for the new building erected by the State National Bank, for which bank the appellee had agreed to undertake liquidation. The two $25,000 drafts were in payment of the $50,000 which the Ft. Worth National Bank had agreed to accept in lieu of the transfer of the Savings Bank stock, charter, etc. These drafts were handed by Presley to the cashier of appellee, who was one of the several officers of appellee present at the conference. These three drafts were drawn upon the funds of the Savings Bank by an officer acting for that bank. No instructions were given by Baldridge at the time as to what entries should be made on the books of the Savings Bank with reference to these drafts, and the two $25,000 drafts were carried on the books as cash items until some time in June, when under Baldridge's direction, they were charged to the charter account of the Savings Bank. This charter account was one kept by the Savings Bank, on which the value of the charter was entered in the sum of $10,500. With this additional entry of the $50,000 item on this account, the value of the charter was made to appear to be $60,500. No entry was ever made on Baldridge's personal account as the result of this transaction, and the entries stood as so entered on the charter account when the Savings Bank closed its doors, and when Baldridge committed suicide, the day after, on, to wit, July 4, 1915, and when the receiver was appointed. The two $25,000 drafts were deposited with appellee bank and collected in due course. At the time of the transaction detailed above Baldridge was regarded by all the officers and directors of appellee, and by the other officers of the Savings Bank and by the public generally, as being a man of wealth, probably worth some $800,000 above his liabilities, with holdings of a diversified nature, bank stock, ranches, cattle, etc. His business integrity was regarded as of the best. No one connected with the transaction, save perhaps Baldridge himself, had actual knowledge of any intent on Baldridge's part to misappropriate any of the funds belonging to the Savings Bank, or that he was insolvent, or that he would not adjust matters by paying for the two $25,000 drafts. Presley did not know at the time for what purpose these drafts had been drawn, nor that they were drawn in payment of Baldridge's personal obligation. No inquiry was made by any of appellee's officers or directors as to why the drafts were drawn in this way or as to whether Baldridge had paid for or made

arrangements or was financially able to pay for said drafts. They regarded the drawing of the drafts as regular, and did not question the bona fides of Baldridge's acts until shortly before this suit was filed. At this time Baldridge was one of the vice presidents of the appellee, and had an office and desk in the appellee's bank building, and the two banks were conducting their business within a few doors of each other. Appellee's officers believed at the time that the Savings Bank was entirely solvent. It had a large number of depositors. It had been customary in banking circles in Ft. Worth for years for officers of banks to draw drafts on the funds of the banks with which they were connected in payment of their personal indebtedness, but, of course, by making the proper arrangements for the purchase of such drafts out of their personal funds or by their personal obligations. In Kitchens v. Teasdale Com. Co., 105 Mo. App. 463, 79 S. W. 1177, it was held that the existence of such customs would not affect the legal consequence that a payee of drafts so drawn, who knew that the funds were to be applied in payment of the bank officers' personal debts, would be liable to repay the same to the bank.

As a matter of fact, as disclosed by later investigation, Baldridge at this time was very heavily in debt. While he owned and controlled extensive properties, much of it was covered by mortgages. On April 10, 1914, Baldridge's personal account with the Savings Bank showed an overdraft of $440,000. The Reid Cattle Company, in which Baldridge was largely interested, and whose ranch was located in Ector county, owed the Savings Bank at this time $134,000, the notes representing which indebtedness were signed by Reid and Baldridge. Baldridge finally sold as his own the lands comprising this ranch, and the Reid Cattle Company was left without known assets with which to satisfy this indebtedness. The Ward Cattle Company, whose notes were indorsed by Baldridge, owed the Savings Bank some $121,643. These notes were discounted to the Savings Bank for $117,000, and Baldridge got the proceeds less the discount. One of the notes was eventually paid by charging it to Baldridge's personal account. The W. H. Lyons note for $92,508, secured by a mortgage on some cattle, was another item which the books of the Savings Bank listed as an asset, but which proved to be worthless, and was later charged to profit and loss. Baldridge collected the proceeds from the sale of the cattle upon which a mortgage was held by the Savings Bank to secure this note, placing such proceeds to his own credit. Another concern in which Baldridge was interested, to wit, Godair, Baldridge & Bursey, had an overdraft. At this time the Savings Bank's indebtedness ex-

ceeded the actual value of its assets by about $400,000. Baldridge, it appeared after his death, was insolvent on April 10, 1914, to the extent of some $700,000, though he consummated some rather large deals subsequently to the above date, and up to the time of his death maintained the reputation of being a man of considerable means. Since this appeal is from a judgment following a peremptory instruction, it is our duty to give effect to certain phases of appellant's evidence about which there may be some conflict. If the evidence presented issues of fact, which should have been submitted to the jury, the trial court erred in giving the peremptory instruction.

The first assignment is directed to action of the trial court in giving the peremptory instruction in favor of defendant. The first proposition under this assignment is to the effect that an officer of a corporation cannot act for and bind the corporation in a transaction where his interests are adverse to those of the corporation, and notice of his personal interest in such transaction is notice to the other party of his want of authority, and requires inquiry to be made by such party, independent of the acts of such officer, to ascertain as certain the authority under which the officer acts. The uncontroverted facts show that the officers of appellee who consummated the deal with Baldridge and accepted the drafts knew that the drafts were drawn on the Savings Bank's funds, and knew that such drafts were being used in payment of Baldridge's individual obligation. They did not have any actual knowledge of Baldridge's insolvent condition, nor of the insolvent condition of the Savings Bank, nor that Baldridge at the time had an overdraft with the Savings Bank in any amount, or that Baldridge had not made or would not make arrangements with the Savings Bank to purchase and pay for said drafts out of his individual funds. No one connected with the appellee made any inquiries or investigation as to these matters, either at this time, or before the drafts were collected, or thereafter. They just never questioned the good faith or regularity of the transaction.

[1] It is a rule of general application that an officer whose interests are adverse cannot bind the corporation except as to innocent parties. Tenison v. Patton, 95 Tex. 284, 67 S. W. 92; Scott v. National Bank, 97 Tex. 31, 75 S. W. 7, 104 Am. St. Rep. 835; San Antonio St. Ry. Co. v. Adams, 87 Tex. 125, 26 S. W. 1040; 10 Cyc. p. 912. Nor are acts of manifest bad faith on the part of the officer binding on the corporation, and strangers who participate in such wrong against the corporation may not profit thereby. 10 Cyc. 911, and authorities cited. In addition to the general rule of agency that every person dealing with an assumed agent

is bound, at his peril, to ascertain the nature and extent of the agent's authority, it would seem that where, in a particular transaction, knowledge is brought to the third party that the agent has an interest adverse to that of the principal, or is using the funds, property, or credit of his principal for the benefit of the agent himself, it is sufficient to put such a third person on notice of want of authority on the part of the agent to bind the principal. 2 Mechem on Agency, § 1728. In U. S. Fidelity & Guar. Co. v. Adoue & Lobit, 104 Tex. 379, 137 S. W. 648, 138 S. W. 388, 37 L. R. A. (N. S.) 409, Ann. Cas. 1914B, 667, where a guardian, who embezzled some $12,000 of his ward's estate, deposited $5,000 of his own money to his own account in the bank, and obtained from the bank a loan of $7,000, credited to his personal account, and then received from the bank a certificate of deposit for $12,000 to him as guardian, and later, upon a surrender of the certificate of deposit, had his personal note to the bank in the sum of $7,000 canceled, and received credit to his personal account in the sum of $5,000, which amount was checked out, it was held that the bank was liable, for the full amount, to the bonding company which had made the guardian's bond on the faith of the certificate of deposit issued by the bank, and which bonding company had, upon the guardian's subsequent defalcation, been required to satisfy the bond. Good faith on the part of the bank was found by the trial court, and that there was no agreement that said $12,000 should be left on deposit, and that there was no actual knowledge on the bank's part of the guardianship existing, neither did the bank profit by the transaction, no interest having been charged for the $7,000 loan. See, also, Moore v. Hanscom, 101 Tex. 293, 106 S. W. 876, and 108 S. W. 150; Lamson v. Beard, 94 Fed. 30, 36 C. C. A. 56, 45 L. R. A. 822; Gale v. Chase Bank, 104 Fed. 214, 43 C. C. A. 496; Hier v. Miller, 68 Kan. 258, 75 Pac. 77, 63 L. R. A. 952; Rochester Co. v. Paviour, 164 N. Y. 281, 58 N. E. 114, 52 L. R. A. 790; De Baca v. Higgins, 58 Colo. 75, 143 Pac. 832, L. R. A. 1915B, 1091. In De Baca v. Higgins, supra, the Supreme Court of Colorado held that, even though the president of a bank owned all of its stock, yet he was trustee for the depositors, and the bank would not be bound where he had used its funds to discharge his individual debts, unless such act was authorized or ratified. That as the president was the only one connected with the bank having knowledge of the misappropriation his silence or acquiescence would not operate as a ratification of his wrongful act. Here, as in the instant case, there was no contention of any actual fraudulent participation on the part of the person to whom the funds of the bank were paid. The court found absolutely good faith as a matter of fact, but held that such party was charged by law with notice of the actual facts, in that in payment of the individual debt of the president such person had accepted a certificate of deposit and a check and a draft on the bank's funds. The court said:

"An agent is not vested with authority to appropriate the funds of his principal to pay his debts, and therefore a creditor of a bank official receiving a draft or other obligation of the bank, which the officer represents, in payment of his individual obligation, which show upon their face that they were issued by himself, is advised that thereby the officer is appropriating the assets of the bank to pay his individual indebtedness, and is therefore liable to the bank for the funds so received; or the obligation is nugatory in his hands, unless he establishes that the bank official was authorized to issue such obligations, or his act has been ratified by the bank" (citing cases).

In Lamson v. Beard, supra, where the president of a bank as such drew drafts on the bank's funds in payment of his personal obligation, it was held that the payees were put upon inquiry as to the president's authority to draw the same for his own benefit, which inquiry the payees should have made of the directors, though they were not charged with the duty of investigating the bank's books to ascertain whether the president had reimbursed the bank. In the instant case we are of the opinion that the uncontroverted facts tend strongly to show that the officers of the Ft. Worth National Bank, by reason of what occurred at the time, as well as by reason of their general knowledge of the conditions existing in regard to the affairs and management of the Savings Bank, were charged with knowledge that Presley in drawing the drafts in question was acting under the direct authority of Baldridge, and was not exercising any independent discretion, and that in all probability, as Presley testified, Presley did not know for what purpose the drafts were drawn; that, in directing Presley to draw the drafts upon the funds of the Savings Bank, Baldridge was in effect drawing such drafts himself, in payment of his own obligation. We must presume that, if inquiry had been made of Presley, Alexander, or the other resident directors, they would have told the truth, and would have stated to the inquirer that Baldridge had not in fact purchased the drafts with his own funds, and had not made any arrangements with the Savings Bank so to do. Hence, as we view it, the case before us is not different in law and effect from what it would have been if Baldridge himself had drawn the drafts, and we will so treat it, and discuss the principles of law involved upon that theory.

In Gale v. Chase Nat. Bank, 104 Fed. 214, 43 C. C. A. 496, in which Lamson v. Beard is cited with approval, the court held that a cashier of a bank, as such, has no authority to issue cashier's drafts to his own order in payment of his individual debts, and a creditor accepting such drafts so drawn takes

the risk of such lack of authority; and, to warrant the conclusion that he had implied authority so to do from the directors, a settled course of business covering years must be shown in which the officer had exercised such authority. An officer of a bank is not presumed to have authority to bind the bank in a transaction involving his personal interests and liability, and one who seeks to bind the bank must prove actual authority before he can prevail. Bank v. Parmalee, 95 U. S. 557, 24 L. Ed. 490; Moores v. Bank, 111 U. S. 156, 4 Sup. Ct. 345, 28 L. Ed. 385; Hier v. Miller, 68 Kan. 258, 75 Pac. 77, 63 L. R. A. 952; 1 Moore on Banks and Banking, pp. 211 and 234.

Appellee cites a number of cases in support of the contention that it was not charged with notice of any want of power in Presley to issue these drafts for the purpose for which they were used, among which are Goshen National Bank v. State, 141 N. Y. 379, 36 N. E. 316; Phillips v. Bank, 140 N. Y. 556, 35 N. E. 982, 23 L. R. A. 584, 37 Am. St. Rep. 596; Bank v. Peck, 180 Ind. 649, 103 N. E. 643; Pemiscot County Bank v. Ward Co., 135 Tenn. 426, 186 S. W. 598; Swift v. Smith, 102 U. S. 442, 26 L. Ed. 193; Armstrong v. Bank, 133 U. S. 433, 10 Sup. Ct. 450, 33 L. Ed. 747.

In the Goshen Bank Case, perhaps the strongest in appellee's favor, the New York Court of Appeals held, in an opinion by Justice Peckham, now on the United States Supreme Court, that the bank could not recover from the state the proceeds of a draft drawn by the cashier in payment of his individual taxes, the receiving officer of the state having no knowledge of the fraudulent use of the bank's funds for this purpose. There the learned judge said:

"We think the question as to whether the state was a holder of the draft for value or not does not arise in this case. Murray, as county treasurer, was behind in his payment of the taxes due from Orange county to the state. In order to discharge his obligation, he transmits the draft in question. The state, through its officer, receives it, and presents it to the bank upon which it is drawn, and that bank pays it; and the state, having received the money, thereby discharges the obligation of Murray, and the taxes due from Orange county are thereby paid. The transaction is done, and it cannot be that the drawer of the draft that has thus been paid can open up the whole, and claim to recover back the money which the state received in payment of the taxes due it. If the cashier, instead of sending this draft, had taken the money directly from the bank, and paid the same in satisfaction for the amount due for the taxes, I think no one would contend that the bank could recover it back from the state on the ground that the act of the cashier (who was also county treasurer) in taking the money was a fraud upon it, or even a felony, and that the state had parted with no value at the time of the receipt of the money."

Perhaps the Goshen Bank Case may be differentiated from the one before us in several particulars, two of which may be mentioned, to wit: (1) It does not appear to have been a judgment upon peremptory instruction. It was an appeal from an award of nothing on a claim filed by the bank with the State Board of Claims. While we have not access to the New York act creating this board, and defining its powers and limitations, yet the general rule must be recognized that the sovereign state cannot be sued or held liable in the courts of justice save in such cases as it has itself consented to be made liable. Locke v. State, 140 N. Y. 480, 35 N. E. 1076. (2) The draft in the Goshen Bank Case was sent to a distant creditor; here it is delivered to a payee directly. This distinction is perhaps recognized in Lamson v. Beard, supra. In the instant case there appears no reason if Baldridge had the necessary funds to his own credit in the Savings Bank, with which to pay the $50,000, that he should not have given his personal check on the Savings Bank, rather than to use the medium of bank drafts drawn on the New York and St. Louis banks.

But if the Goshen Bank Case cannot be differentiated from the instant case because of the difference as to the facts and circumstances, then we think that in effect the Goshen Bank Case has been overruled by later decisions of the New York court. Ward v. City Trust Co., 192 N. Y. 61, 84 N. E. 585; Rochester & Charlotte Turnpike Road Co. v. Paviour, 164 N. Y. 281, 58 N. E. 114, 52 L. R. A. 790, and other cases cited in Lanning v. Trust Co., 137 App. Div. 722, 122 N. Y. Supp. 485. In the last case it is said:

"One who receives from an officer of a corporation its money or property in payment of his personal debt does so at his peril, and if the person receiving the same knows, or facts are presented which, if acted upon, would disclose, that such officer was thereby appropriating the funds of the corporation, he is liable to it for the amount so received [citing authorities]. The defendant knew it was receiving a check of the corporation in payment of Twining's individual indebtedness. Does the fact that it was not signed by Twining, but by another officer, under the facts and circumstances here presented, take the case out of the general rule? I think not."

In Ward v. City Trust Co., supra, the president of a corporation delivered to the defendant a check payable to the order of the corporation, indorsed by himself as president, in payment of the individual debt of himself and another officer. The court, in reversing a judgment for defendants, said:

"The effect of such notice was to put the trust company upon inquiry to see whether it was about to accept money from one to whom it did not belong in payment of its own claim. The presumption arising from the face of the check was that it belonged to the Hartman Company, and that its president had no right to use it to pay his personal debt. The purpose of the law in exacting inquiry under such circumstances is to see whether the apparent situation is the actual situation; or, in other words, whether facts exist to rebut the presumption."

In Lamson v. Beard, supra, it is stated that "unusual and special authority" was

given the cashier in the Goshen Bank Case to sign the draft on the bank's funds in payment of his personal indebtedness. In Gale v. Chase Nat. Bank, supra, the federal Circuit Court of Appeals construes the Goshen Bank Case as being one showing that the cashier had express authority to draw his own order upon the bank's funds upon the same terms as he would for a customer who had paid therefor.

In the Tennessee case of Pemiscot Bank, supra, also relied on by appellee, the court recognized the rule that a bank officer is, in the absence of express authority, without power to bind his corporation by a draft drawn on its funds in payment of his personal debt, for there the court said:

"A cashier, as such, has no implied power to draw such drafts in his own favor, or in favor of a creditor in payment of his own debts; and a person who accepts a draft, drawn by a cashier, payable to himself or used in payment of the individual indebtedness of himself, is put on notice that the fiduciary is discharging his own obligation with the funds of his principal, the bank, and the recipient is not to be treated as an innocent holder of the draft or its money product, and may be called to account for the proceeds by the bank."

This last-cited case questions the Goshen Bank Case holding as an announcement of a general rule, even in New York, and refers to later New York cases, one opinion, being by Judge Peckham himself, seeming to limit the holding in Goshen Bank Case to the peculiar facts there shown.

[2] Without further prolonging the discussion upon this one issue, the majority of us, at least, are of the opinion that the court erred in giving the peremptory instruction for the defendant, and that, unless the facts sustained defendant's plea of estoppel, judgment should have been rendered for plaintiff. The evidence upon this issue does not seem to have been fully developed. At the time of trial Noah Harding, who was active vice president of the Ft. Worth National Bank at the time of the transaction in controversy, and who had been appointed liquidating agent for the State National Bank, was dead. He had been one of the representatives of the Ft. Worth National Bank in the negotiations between it and Baldridge, and was one of the officers of said bank who was present at the time the deal was consummated by the issuance of the two drafts in the aggregate sum of $50,000. Baldridge was dead. Thus death had claimed perhaps the two principal parties in the negotiation. The evidence is not very clear as to who constituted the directors, other than Baldridge, Presley, and Alexander, of the Savings Bank at the time of this transaction and up to the time of the death of Baldridge. Nor is it shown to a satisfactory definiteness whether said directors, other than the three mentioned, knew of the nature of the transaction, and that Baldridge had in fact used the funds of the Savings Bank to pay his individual debt, or that the amount of said drafts had been charged on the books of the Savings Bank to the charter account. It is further somewhat uncertain as to whether a directors' meeting of the Savings Bank was called or had during the some 16 months intervening between the transaction in question and the closing of the bank.

[3] The assent or approval of a corporation to acts done on its account may be inferred in the same manner that the assent of a natural person may be, and it is well settled that where a corporation, with full knowledge of the unauthorized act of its officers or agents, acquiesces in and consents to such acts, it thereby ratifies them, especially where the acquiescence results in prejudice to a third person. It would seem that in order for acquiescence to amount to ratification, without knowledge of the unauthorized act, it should generally appear that the party dealing with the unauthorized officer or agent should have been prejudiced, damaged, or misled thereby. 7 Ruling Case Law, § 666. But it is said in Hammond v. Hopkins, 143 U. S. 250, 12 Sup. Ct. 427, 36 L. Ed. 145, Mr. Chief Justice Fuller, speaking for the Supreme Court:

"No rule of law is better settled than that a court of equity will not aid a party whose application is destitute of conscience, good faith, and reasonable diligence, but will discourage stale demands, for the peace of society, by refusing to interfere where there have been gross laches in prosecuting rights, or where long acquiescence in the assertion of adverse rights has occurred. The rule is peculiarly applicable where the difficulty of doing entire justice arises through the death of the principal participants in the transactions complained of, or of the witness or witnesses, or by reason of the original transactions having become so obscured by time as to render the ascertainment of the exact facts impossible."

In Fifth National Bank v. Iron City National Bank, 92 Tex. 436, 49 S. W. 368, by direction of plaintiff's cashier, defendant applied plaintiff's deposit to payment of such cashier's personal debt to plaintiff, and, returning him the note so paid and collateral held to secure it, sent plaintiff, at the end of the month, a statement showing such application of its deposit. To this application no complaint was made by plaintiff until nearly a year later, when suit was brought for the money so misapplied, at a time when the cashier was insolvent and had become fugitive from justice. The Supreme Court affirmed the judgment of the Court of Civil Appeals for the Fourth District, which court had reversed the judgment of the trial court overruling plaintiff's plea that the defendant was estopped from denying the authority of its cashier to apply funds belonging to the defendant bank, and deposited with the plaintiff bank, to the payment of the cashier's individual obligation. After stating that, upon the application of the deposit of the defendant to its cashier's individual debt,

plaintiff returned to said cashier the collateral securing his note, and also sent to the defendant bank a statement showing said application of the funds, which statement was later found in the vaults of the defendant bank, with its bookkeeper's "O. K." on it, the court says:

"The rule of law is well settled that it became its (defendant's) duty to examine same within a reasonable time and notify the San Antonio bank if it questioned the authority of Richardson to have said notes charged to its account, as it appeared from the face of said statement had been done; and that its failure to do so will estop it from denying such authority, if such failure has operated to the prejudice of the San Antonio bank."

It was contended there, as here, by appellant, that the defaulting officer was insolvent, and that the bank which had accepted the check in payment of the cashier's personal indebtedness could not have recovered against the cashier. The court discussed this phase of the case in the following words: "It may be conceded, as contended by the Court of Civil Appeals, that Richardson owned no property, and yet it cannot be said as a matter of law that by prompt and prudent action the San Antonio Bank could not have obtained from him anything. Debts are often collected from persons who really owe more than the value of their property."

It was said in Seale v. Baker, 70 Tex. 283, 289, 7 S. W. 742, 744 (8 Am. St. Rep. 592): "Directors of banking corporations occupy one of the most important and responsible of all business relations to the general public. By accepting the position and holding themselves out to the public as such, they assume that they will supervise and give direction to the affairs of the corporation, and, impliedly, contract with those who deal with it, that its affairs shall be conducted with prudence and good faith. * * * It is the duty of directors to know the condition of the corporation whose affairs they voluntarily assume to control, and they are presumed to know that which it is their duty to know, and which they have the means of knowing."

[4] The testimony of R. E. Harding, at the time of the transaction assistant cashier of appellee bank, and at the time of suit the vice president thereof, supports appellee's contention that had it been notified by the directors of the Savings Bank that the application of the latter's funds to the payment of Baldridge's obligation was not authorized, that appellee could have, in part at least, recouped itself for any loss sustained out of funds of Baldridge on deposit in the Ft. Worth National Bank, and out of property, including the Erath county ranch, owned by Baldridge. We think the record discloses a condition of evidence that would have authorized and required the court to submit to the jury the question of estoppel pleaded by defendant.

For the reasons stated, the judgment of the trial court is reversed and the cause remanded for further proceedings not in conflict with this opinion.

Reversed and remanded.