## FORT WORTH NAT. BANK v. HARWOOD. (No. 193–3245.)

(Commission of Appeals of Texas, Section A. March 30, 1921.)

1. **Banks and banking** ⬿118—**Exercise by president of power to issue drafts assumed to be lawful.**

The exercise by the president of a bank of the general power to issue its drafts, which power may be expressly given by board of directors or conferred by established custom, and which, if no restriction is placed on it, includes authority to issue drafts in payment of his own debts, is assumed to be lawful in the absence of opposing facts.

2. **Bills and notes** ⬿341—**One receiving president's draft in payment of individual debt not put on inquiry as matter of law whether it was paid for.**

Merely because a bank's draft is issued by its president in payment of his individual debt, the creditor is not as matter of law charged with duty of inquiry as to whether it had been paid for, though the president's power to issue drafts, whether in payment of his own debts or to another, is conditioned on the bank's being paid therefor; the presumption of honesty being indulged.

3. **Banks and banking** ⬿112—**Whether one receiving president's draft in payment of individual debt was put on inquiry held question of fact.**

Whether one receiving a bank's drafts in effect drawn by its president in payment of the president's individual debt was put on inquiry as to his having paid therefor held a question of fact in view of evidence of the president's known absolute control and domination of the bank's affairs, the large amount of the drafts, and the fact of their being drawn on different and distant banks.

4. **Banks and banking** ⬿113—**Whether a bank had ratified issuance of drafts by president and was estopped to deny authority question of fact.**

Whether a bank had by its directors acquiesced in or ratified the issuance of drafts by its president, and hence was estopped to deny his authority, *held*, under the evidence, a question of fact.

Error to Court of Civil Appeals of Second Supreme Judicial District.

Action by Brown Harwood, receiver, against the Fort Worth National Bank. Judgment for defendant was reversed by the Court of Civil Appeals (205 S. W. 484), and defendant brings error. Judgment of Court of Civil Appeals affirmed.

Ross, Ross & Alexander and Slay, Simon & Smith, all of Fort Worth, for plaintiff in error.

R. W. Flournoy and Marshall Spoonts, both of Fort Worth, for defendant in error.

TAYLOR, P. J. E. E. Baldridge in 1914 was president of the Fort Worth Savings Bank & Trust Company, and owned practically all of its stock. He was president also of the State National Bank of Fort Worth, and was vice president of the Fort Worth National Bank. The Fort Worth Savings Bank & Trust Company and Fort Worth National Bank will be referred to herein as the Savings Bank and National Bank, respectively.

T. M. Presley and A. C. Alexander were vice president and cashier, respectively, of the Savings Bank. Although active officials of the bank, their services were performed under the direction of Baldridge as president and manager, and were largely clerical. The directors were Baldridge, Presley, and Alexander, and James Callan, F. H. Sherwood, and C. A. Goldsmith.

In January, 1914, the National Bank agreed with Baldridge to take over the liquidation of the State National Bank. One of the terms of the agreement was that Baldridge should transfer to the National Bank all of the stock of the Savings Bank, the conveyance carrying with it, of course, the bank's charter. About the 1st of April, 1914, Baldridge asked to be released from his obligation to transfer the stock. Finally, at a conference on April 10, 1914, held in the directors' room of the Savings Bank, it was agreed that Baldridge should be released from his obligation as requested, on condition that he pay to the National Bank the sum of $50,000. There were present at the conference Baldridge, representing the Savings Bank, and R. E. Harding, Noah Harding (deceased at the time of the trial), Sam Davidson, Mr. Sandidge, and Elmo Sledd, directors and officers of the National Bank.

Upon reaching the agreement referred to Baldridge called Presley from his work in the bank to the conference, and directed him to draw two drafts for $25,000 each on two of the Savings Bank's correspondent banks in New York and St. Louis, respective-

ly, payable to the National Bank. Presley drew the drafts, signed them as vice president, and forthwith delivered them, as directed by Baldridge, to Mr. Sledd, the cashier of the National Bank.

Presley testified he knew nothing of the purpose for which the drafts were given. He was in the habit of doing whatever Baldridge told him in respect to the conduct of the business. It was generally understood by those at the conference representing the National Bank that whatever Baldridge said relating to the Savings Bank's affairs "went in the bank." . Presley acted in the matter wholly at the instance of Baldridge and in accordance with his instructions. The drafts will therefore be referred to hereafter as if drawn and delivered by Baldridge himself.

It was several weeks before an entry of any character was made on the books of the Savings Bank growing out of the issuance of the drafts. During that time they were taken into consideration in working out the bank's daily balances, without being charged to any account; and on June 13, 1914, were charged to charter account by the bookkeeper, at the instance of Baldridge.

The charter account, as originally kept, purported to represent the value of the charter under which the Savings Bank operated. It was granted prior to 1876 and permitted certain banking privileges supposed to give it some value. The only entry on the account at the time the drafts were charged was one showing the charter as an asset of the bank of the value of $10,000. With the additional charge entry of $50,000, the value of the charter was made to appear at $60,500. The drafts were never charged to Baldridge's account, and were never paid for by him. It does not conclusively appear that any officer of the Savings Bank, other than Baldridge, had any knowledge at the time the drafts were issued, or prior to the bank's default, of the purpose for which they were given.

The drafts were duly paid, and the National Bank received the proceeds. The Savings Bank received no benefit from their issuance or payment.

On July 23, 1918, the Savings Bank closed its doors. The next day Baldridge committed suicide. A few days later Brown Harwood was appointed receiver. Upon an auditing of the bank and an investigation of its affairs and Baldridge's transactions in relation thereto extending over a period of several months, the receiver discovered that Baldridge, by means of the drafts, paid off and discharged out of the funds of the Savings Bank his individual debt to the National Bank growing out of its agreement to release him from his stock obligation. Following this discovery the receiver made demand upon the National Bank for return of the amount of the drafts, with interest. The demand was not complied with, and this suit was' filed for its enforcement, about 20 months after the drafts were collected.

The petition alleges that the drawing of the drafts and the use of the proceeds thereof constituted a fraudulent appropriation on the part of Baldridge; that the National Bank had actual and constructive notice that the payment so made out of the funds of the Savings Bank were made without authority, and were not binding on the bank. The material pleadings of the National Bank on the facts were a general denial, pleas of estoppel and ratification on the part of the Savings Bank, and laches on its part in asserting the demand sued upon.

Upon trial before a jury a peremptory instruction was given in favor of the National Bank. The honorable Court of Civil Appeals in an opinion agreed to by a majority of the court, reversed the judgment, and remanded the cause. 205 S. W. 484.

Applications for writ of error were made by both banks, and both applications were granted by the Supreme Court, under the view that the court preferred to hear the case "in view of the importance of the question."

It was the view of the majority of the Court of Civil Appeals that the National Bank, having accepted Baldridge's drafts in part payment of his individual debt, was, as a matter of law, put upon inquiry as to his authority to issue the particular drafts, and of seeing whether or not he had paid the bank for them; that, except for the fact that it was a question for the jury as to whether or not the Savings Bank was estopped to deny the authority of Baldridge to issue the drafts, the trial court should have given peremptory instruction in favor of the Savings Bank.

The case is not without difficulty. It is strongly urged that, because of the personal nature of the transaction in which the drafts were issued, the act of Baldridge did not bind the Savings Bank; that his action in appropriating the funds for his own use, in the absence of authority, either express or implied, was illegal. Chrystie v. Foster, 61 Fed. 551, 9 C. C. A. 606, Lamson v. Beard, 94 Fed. 30, 36 C. C. A. 56, 45 L. R. A. 822, Claflin v. Farmers' Bank, 25 N. Y. 293, and other cases, are cited in support of the contention.

[1, 2] While the president of a bank has no inherent power over the bank's property, and has no implied power to use the funds of the bank to pay his personal obligations, he has general authority to issue the bank's drafts. It is well known that presidents of banks have such general authority and customarily exercise it. It is stated in the opin-

ion of the Court of Civil Appeals that it had been the custom in banking circles in Fort Worth for years for officers of banks to draw drafts on the funds of the banks with which they were connected in payment of their personal indebtedness, the court adding, "but, of course, by making the proper arrangements for the purchase of such drafts out of their personal funds, or by their personal obligations."

General power to draw drafts on a bank's funds may be expressly given to the president by the board of directors, or it may be conferred by established usage. Morse on Banks & Banking (5th Ed.) vol. 1, § 144. The exercise of the general power by the president is assumed to be lawful in the absence of opposing facts. If no restriction is placed upon the power of the president, he has the same authority to issue drafts in payment of his personal debt as he has to issue them to strangers. In both instances the power to issue is conditioned upon the bank's being paid for the draft, and in neither instance does the authority to issue the draft exist where payment is not made. When an officer having authority to issue the bank's drafts issues a draft in payment of his individual debt, it must be presumed either that it is misappropriation of the bank's funds, or else that the officer has paid, or will pay, the bank for the draft. If the presumption that the officer is guilty of misappropriating the funds be indulged, then the duty to make inquiry as to the bona fides of the transaction arises as a matter of law, but not otherwise. The presumption of honesty, rather than dishonesty, on the part of an officer clothed with authority, should be indulged.

The case of Goshen National Bank v. State, 141 N. Y. 379, 36 N. E. 316, is in point on the question of the duty of the National Bank to make inquiry as to whether Baldridge had not paid, or would not pay, for the drafts. This case has been distinguished on the facts in some of the later opinions of the New York courts, but we do not find that it has been overruled. On the contrary, its holding has been subsequently approved by the New York Court of Appeals.

The material facts of the case are that the cashier, who was also county treasurer of the county in which the bank was located, sent to the comptroller of the state of New York in payment of his individual debt to the state for a balance due for taxes, a draft of the bank upon one of its corresponding banks in New York, signed by himself as cashier. The comptroller collected the draft and paid the proceeds into the treasury of the state. The cashier paid no money to the bank for the draft and made no entry upon its books showing that he drew it. He did not have then or thereafter any money to his credit in the bank. The bank filed a claim against the state with the board of claims for the amount of the draft. From an award of nothing the bank appealed. As a basis for the holding of the court Judge Peckham, who wrote the opinion, says:

"There is no claim that the comptroller, or any state officer, had any actual knowledge of the wrongful acts of the cashier before the comptroller was informed thereof in July, 1892. The board of claims has found that the comptroller received the draft in good faith, and without knowledge that it was issued by Murray wrongfully or without authority of the claimant. It was also proved on the trial that the cashier had the custody and possession of the blank drafts for the claimant, and that he had the right to sign drafts drawn by the claimant on its corresponding banks, and that he had the right to draw a draft on the corresponding bank of the claimant for himself upon the same terms that he had to draw a draft for a stranger."

The court's holding is as follows:

"It is the right and duty of the cashier of a bank to sign the drafts drawn in its behalf upon its corresponding bank. This is part of the ordinary duties of such an officer, and affirmative evidence of his power to sign drafts appears in this record, and it also appears that he had the right to draw such draft for himself upon the same terms that he would have had in case of a third party, which means, I assume, upon payment to the bank of the amount of the draft.

"There was an apparent authority to draw the draft; it appeared to have been drawn in the course of the employment of the cashier, and it was an act which was within the scope of his general powers.

"We do not think that, in the case of a bank draft so drawn, the party receiving it would be charged with the duty of inquiry or with notice of the fact that the cashier had not paid for the draft, and that he was therefore using the funds of the bank to pay his private debt. He would only be so using them in case he did not pay for the draft, and its form might be the same even if he had paid for it in full. We think there is nothing unusual or suspicious in this form of making the draft payable direct to the creditor of the cashier, nor any notice that in so doing the bank's funds have been improperly used. Bank or cashier's drafts are used so enormously at the present time in the payment or settlement of debts and in other commercial transactions that they have almost acquired the characteristics of money. So long as they are drawn on behalf of a solvent bank and upon a solvent drawee, and signed by one of the officers usually signing such instruments, they are regarded by the commercial community very much the same as so much cash, and the fact that the draft was drawn by a cashier directly in favor of his own creditor and sent to that creditor by him would not naturally give rise even to the suspicion that there was anything irregular, fraudulent, or wrong in the conduct of the cashier. The presumption would be that he had performed his duty and paid for the draft, and that it therefore was his property."

It should not be held, we think, as a matter of law, that the National Bank was charged with the duty of inquiry as to whether Baldridge had not paid, or would not pay, for the drafts. The opinion of the Court of Civil Appeals states that—

"No one connected with the transaction, save perhaps Baldridge himself, had actual knowledge of any intent on Baldridge's part to misappropriate any of the funds belonging to the Savings Bank, or that he was insolvent, or that he would not adjust matters by paying for the two $25,000 drafts."

It is in evidence that it was customary in banking circles in Fort Worth for officials of banks to draw drafts on the funds of the banks with which they were connected in payment of their personal debts. The National Bank had acted as a clearing house for the Savings Bank for some time prior to the issuance of the drafts in question. The Savings Bank's drafts were cleared daily, signed just as the drafts in question were, and were paid by the Savings Bank. Some of these, Presley testified, were issued in payment of Baldridge's personal debts. Baldridge, according to the testimony, while in fact insolvent at the time of the draft transaction, was reputed to be a man of large means, and of unquestioned integrity. He had large holdings of a diversified nature consisting of bank stock, ranches, cattle, etc.

[3] Neither do we think it should be held conclusively that the National Bank was not put upon inquiry as to whether Baldridge had paid, or would pay, for the drafts. The state of the evidence does not warrant such holding, notwithstanding the facts are practically undisputed. The evidence indicating absolute control and domination of the Savings Bank's affairs by Baldridge, the large amounts for which the drafts were drawn, the fact that they were drawn on different and distant banks, all are circumstances forbidding that it be determined as a matter of law that the National Bank was not charged with the duty of inquiry.

Whether the duty of inquiry arose on the part of the National Bank is, in our opinion, one of fact.

[4] We concur in the holding of the Court of Civil Appeals that it was also a question of fact as to whether or not the Savings Bank had, by its directors, acquiesced in or ratified the issuance of the drafts by Baldridge, and had hence become estopped to deny his authority. The case should, in our opinion, be remanded for trial upon these two issues, the latter, of course, becoming unimportant if the first should be found in favor of the National Bank.

We recommend, therefore, that the judgment of the Court of Civil Appeals reversing the judgment of the trial court be affirm-ed and that the cause be remanded, with instructions.

PHILLIPS, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.

We approve the holding of the Commission of Appeals on the questions discussed in its opinion.